# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


STATE OF OHIO,                    :        APPEAL NO.   C-230420
                                           TRIAL NO.    B-2204201
    Plaintiff-Appellee,       :

  vs.                             :

                                           *O P I N I O N*

DAVID HALE,                       :

    Defendant-Appellant.      :


Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Reversed and Cause Remanded

Date of Judgment Entry on Appeal: November 27, 2024


*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *John D. Hill, Jr.*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*W.E.B. Norman Law, Inc.*, and *William B. Norman*, for Defendant-Appellant.

**CROUSE, Judge.**

{¶1} In 13 assignments of error, defendant-appellant David Hale challenges his convictions for rape and gross sexual imposition. His convictions were based, in part, on the reports and testimony of two DNA experts from Ohio's Bureau of Criminal Investigation ("BCI"). But in their reports and testimony, those experts relied upon the data, statements, and assurances of *other*, non-testifying analysts at BCI who had performed the physical analysis of the relevant DNA samples.

{¶2} Hale asks us to determine whether, under the United States Constitution's Confrontation Clause, he had a right "to be confronted with" those non-testifying analysts. In light of the United States Supreme Court's recent decision in *Smith v. Arizona*, 602 U.S. 779 (2024), we hold that he did. The statements of the non-testifying analysts, which were necessarily embedded in the State's expert witnesses' testimony, constituted testimonial hearsay. Hale therefore had a constitutional right to be confronted with *those* analysts, not merely with the authors of the final reports. Because he was not, we reverse Hale's convictions. However, because we also hold that the State's evidence at trial was sufficient, we remand the cause for a new trial.

## I. BACKGROUND

### A. Factual Background

{¶3} Over a weekend in March 2022, Hale traveled to HorrorHound, a horror film convention in Sharonville, Ohio, with three of his children, as well as his older daughter's boyfriend. Hale's younger daughter, C.H., was 14 at the time, and a part of this group. All five stayed in a motel in Sharonville—Hale and C.H. in one room, and everyone else in the other.

{¶4} What happened at the motel was the crux of the trial. C.H. would later tell Detective Christopher Wilson in a recorded interview that Hale woke her up

Saturday in the early morning hours by putting his hands inside of her pants and underwear. C.H. said that Hale then removed her clothing, touched her breasts and vagina, pinned her to the bed, and attempted to have sex with her. C.H. told Wilson that she tried to kick and scream to get Hale off of her, but Hale told her to shut up and stop acting like a child. According to C.H., Hale may have slightly penetrated her vagina with his penis. After Hale had ejaculated on himself, C.H. said that she put her clothes back on and tried unsuccessfully to sleep. She also told Detective Wilson that the same sequence of events repeated on the second night of their stay.

{¶5} After returning home, C.H. told her mother and sister what had occurred. C.H.'s mother took her to Reid Hospital for a sexual assault exam. While they were there, Hale arrived at the hospital and allegedly threatened C.H. Shortly thereafter, C.H. was interviewed by a social worker at JACY House, a facility that treats child victims of abuse. Like her later interview with Detective Wilson, the JACY House interview was also recorded. In it, C.H. described events substantially as she would describe them to the detective, with one notable exception: she told the social worker that Hale had performed cunnilingus on her—an allegation she would not repeat in her later interview with Detective Wilson.

{¶6} In June 2022, C.H. went with Hale and her mother to the office of Hale's defense attorney. There, she recanted the allegations in her interviews with Detective Wilson and the social worker at JACY House. However, in September 2022, Detective Wilson conducted his recorded interview with C.H., described above, during which C.H. reiterated most of the relevant allegations from the JACY House interview.

### B. Procedural Background & Trial

{¶7} In September 2022, Hale was indicted on two counts of rape by force or threat of force, in violation of R.C. 2907.02(A)(2); two counts of sexual battery by a

parent, in violation of R.C. 2907.03(A)(5); and two counts of gross sexual imposition by force or threat of force, in violation of R.C. 2907.05(A)(1). Hale pleaded not guilty.

{¶8} At trial, C.H. took the stand for the prosecution, but initially testified that she could not remember the events in question. The prosecuting attorney then played C.H. a recording of her interview with Detective Wilson—within the hearing of the jury—which C.H. said refreshed her recollection. Although C.H. did not restate her allegations while on the stand, she agreed that her statements in the interview that was played before the jury were true. The State also played C.H.'s interview with the JACY House social worker for the jury. Hale countered this evidence with evidence of C.H.'s recantation.

{¶9} Also crucial to the State's case were DNA tests performed on items from the sexual assault kit collected at Reid hospital. According to a report by Katharine Dailey, an analyst with BCI, a swab taken from C.H.'s left breast contained DNA consistent with Hale's—a match that would occur with a frequency of 1 in every 1,000,000 unrelated individuals. And according to a report by BCI analyst Logan Schepeler, the lab subjected an external vaginal swab in the kit to Y-STR testing, a type of DNA testing that looks only at DNA segments on the Y chromosome. The Y-STR test found a male profile not inconsistent with Hale's, but with a much lower degree of specificity—the indicators shared by Hale and the sample were estimated to occur at a rate of "1 in 76 male individuals in the U.S. population." Dailey and Schepeler testified about these findings, and their reports were admitted into evidence.

{¶10} After a four-day trial, the jury deliberated and found Hale guilty of all counts. The trial court merged the sexual battery counts into the rape counts and sentenced Hale to a cumulative, indefinite term of 25 years to 30 years and 6 months. This appeal timely followed.

## II. SUFFICIENCY OF THE EVIDENCE

{¶11} Hale's first assignment of error challenges the sufficiency of the evidence used to convict him. When reviewing the sufficiency of the evidence, an appellate court asks whether, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the elements of the crime proven beyond a reasonable doubt. *State v. Jones*, 2021-Ohio-3311, ¶ 16. Essentially, the court "asks whether the evidence against a defendant, *if believed*, supports the conviction." (Emphasis sic.) *Id.*

{¶12} We begin by noting that, in his numerous other assignments of error, Hale contends that his trial was plagued with evidentiary errors and improperly-admitted evidence—some of which the State concedes.[1] We need not and do not resolve these questions before we review for legal sufficiency of the evidence because, in conducting such a review, we must "consider all of the evidence presented at trial, regardless of whether it was admitted in error." *State v. Kelly*, 2024-Ohio-1864, ¶ 31 (1st Dist.), citing *State v. Brewer*, 2009-Ohio-593, ¶ 17-20. The State was entitled to rely on the trial court's evidentiary rulings in choosing the evidence it presented. Thus, we ask only whether the evidence admitted at trial—including the DNA evidence challenged in Hale's third assignment of error—was sufficient to support the convictions. *See Brewer* at ¶ 24.

{¶13} Hale was convicted of two counts of rape under R.C. 2907.02(A)(2), and two counts of gross sexual imposition under R.C. 2907.05(A)(1).

{¶14} Under R.C. 2907.02(A)(2), Hale could be found guilty of rape if he (1) "purposely compel[led]" C.H., (2) either "by force or threat of force," (3) "to engage in

---

[1] The State, however, argues that any conceded errors were not prejudicial, and therefore not reversible errors.

sexual conduct." In this context, "sexual conduct" is defined to mean "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse." R.C. 2907.01(A).

{¶15} But under R.C. 2907.05(A)(1), the gross-sexual-imposition charges did not require the State to prove "sexual conduct." Instead, Hale could be convicted under R.C. 2907.05(A)(1) if the jury found that he (1) purposely compelled C.H., (2) by "force or threat of force," (3) to submit to "sexual *contact*" with him. (Emphasis added.) "'Sexual contact' means any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

{¶16} Taken in the light most favorable to the State, the Wilson and JACY House interviews, along with the DNA reports and testimony, provided ample evidence from which a jury could permissibly find Hale guilty. C.H.'s interview with Wilson included descriptions of (1) purposeful compulsion, (2) force, and (3) extensive sexual contact. And, while the Wilson interview does not clearly furnish evidence of the "sexual conduct" necessary to sustain the rape charges, the JACY House interview contained a recording of C.H. stating that Hale performed cunnilingus—one of the acts included in the statutory definition of "sexual conduct." *See* R.C. 2907.01(A). True, Hale showed at trial that C.H.'s story had changed over time and that she had, for a time, recanted some of her statements. But the jury was entitled to make determinations regarding C.H.'s credibility, and, on a sufficiency challenge, we must

6

assume it resolved such evidentiary uncertainties in the State's favor.

{¶17}   C.H.'s testimony was further corroborated by the DNA evidence. While the results from the vaginal swab sample were far from conclusive, they did reveal a male profile around C.H.'s genitals that was *not inconsistent* with Hale's. And the DNA found on C.H.'s breast, which matched Hale's with a much higher degree of statistical salience, corroborated C.H.'s broader narrative of events.

{¶18}   For these reasons, we hold that the State's evidence—rightly or wrongly admitted—was more than sufficient to support the jury's guilty verdicts on the rape and gross sexual imposition charges. We therefore overrule Hale's first assignment of error.

### III. CONFRONTATION CLAUSE VIOLATION

{¶19}   In his third assignment of error, Hale challenges the admission of the DNA reports and testimony of BCI analysts Schepeler and Dailey under the Sixth Amendment's Confrontation Clause. According to Hale, the trial testimony revealed that Dailey and Schepeler had not conducted the physical DNA testing themselves, but had relied on out-of-court analysts or technicians to perform the procedures. Hale asserts that the Confrontation Clause protected his right to "be confronted with" these out-of-court technicians, on whose statements Dailey and Schepeler relied. The State and the trial court disagreed, contending any underlying facts and data were not testimonial hearsay that would require cross-examination.

{¶20}   The Sixth Amendment to the United States Constitution, which contains many of that document's protections for criminal defendants, commands that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." The United States Supreme Court has interpreted the Confrontation Clause to "bar[] the admission at trial of 'testimonial statements' of an

absent witness unless she is 'unavailable to testify, and the defendant ha[s] had a prior opportunity' to cross-examine her." *Smith*, 602 U.S. at 783, quoting *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). The Clause does not require all statements be offered live and in the first person—only those statements that are (1) introduced to prove the truth of the matter they assert (the "hearsay prong"), and (2) testimonial in character (the "testimonial prong"). *Id.*

{¶21} We hold that Hale was correct that the DNA testimony and reports in his case satisfied both prongs. To explain why, we will consider each prong in turn, reviewing their application de novo. *See State v. Terry*, 2024-Ohio-2876, ¶ 21 (1st Dist.) ("While admission of testimony is generally reviewed for an abuse of discretion, the question of whether a criminal defendant's rights under the Confrontation Clause have been violated is reviewed de novo." (Cleaned up.)).

### A. The Hearsay Prong

1.

{¶22} The Confrontation Clause is concerned only with "the introduction of hearsay—meaning, out-of-court statements offered 'to prove the truth of the matter asserted.'" *Smith* at 785, quoting *Anderson v. United States*, 417 U.S. 211, 219 (1974). A statement offered "for a reason unrelated to its truth" poses no Confrontation Clause problem. *Id.* Although these concepts are familiar from evidence law, state (or federal) evidentiary rules "do not control the inquiry into whether a statement is admitted for its truth" for Confrontation Clause purposes. *Id.* at 794. The Clause's scope is a question of federal constitutional law and cannot be "defined—expanded or contracted—by reference to non-constitutional bodies of law like evidence rules." *Id.*

{¶23} The Clause's prohibition applies to experts and lay witnesses alike. *Id.* at 785. In *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), the Supreme Court

held that the prosecution may not introduce the contents of a sworn forensic report into evidence, unless that report's author is available to confront the defendant. And in *Bullcoming v. New Mexico*, 564 U.S. 647 (2011), the Court held that the expert witness subject to confrontation in such cases must be the report's author. The prosecution cannot simply circumvent the Confrontation Clause by calling a surrogate expert to regurgitate the authoring analyst's conclusions—even if that surrogate analyst "possess[es] 'the scientific acumen of Mme. Curie and the veracity of Mother Teresa.'" *Id.* at 661, quoting *Melendez-Diaz* at 319, fn. 6.

{¶24} But the Court faltered in *Williams v. Illinois*, 567 U.S. 50 (2012) (plurality opinion), when it failed to muster a majority to decide how the Confrontation Clause applied in a case much like Hale's. In *Williams*, the police had outsourced the initial DNA testing of a rape kit to a private lab. *Id.* at 56. After receiving a profile from the private lab, a state-employed analyst checked it against potential matches in the Illinois database. *Id.* at 59-60. The police got a hit—Mr. Williams—and the state prosecuted him. *Id.* at 59. At trial, however, only the state analyst testified regarding the DNA evidence and analysis; no one from the private testing facility was called, and the private lab's report was not submitted as an exhibit. *Id.* at 62-63. The defendant challenged the state analyst's testimony under the Confrontation Clause, and the trial court overruled the objection. *Id.* at 63-64.

{¶25} Five justices agreed with the trial court's disposition, because all five agreed that the statements were not "testimonial." But they couldn't agree on why. Justice Alito wrote the lead opinion for a four-justice plurality, all of whom voted to affirm on the grounds that (1) when experts rely upon out-of-court statements as the basis for their conclusions, the underlying statements are not *necessarily* being offered for their truth, and (2) statements not made for "the primary purpose of

accusing a targeted individual" are not testimonial. *Id.* at 72-73, 77-79, and 83. Justice Thomas provided the fifth vote to affirm, but did so "solely because" the private lab's "statements lacked the requisite formality and solemnity to be considered testimonial for purposes of the Confrontation Clause." (Cleaned up.) *Id.* at 103-104 (Thomas, J., concurring in judgment only).

{¶26} But a different group of five justices rejected the plurality's hearsay analysis and contended that the private lab's statements *were* offered for their truth. Justice Kagan, in a dissent joined by three other justices, asserted that, by relying upon out-of-court statements from the private lab concerning the DNA profile, the testifying state analyst had implicitly offered those statements for their truth. *See id.* at 119-120 (Kagan, J., dissenting). Justice Thomas agreed with her that "statements introduced to explain the basis of an expert's opinion are not introduced for a plausible nonhearsay purpose," making five for this point. *Id.* at 106 (Thomas, J., concurring in judgment only). However, because Justice Thomas agreed with the plurality's disposition, these five justices did not constitute a proper majority.

{¶27} The jumble of opinions in *Williams* sowed "confusion in courts across the country." (Cleaned up.) *Smith*, 602 U.S. at 789. And after 12 years of this "muddle," the Supreme Court sought to provide clarity in *Smith v. Arizona. Id.* at 789. *Smith* posed a question very similar to one posed in *Williams*: When a testifying expert provides "independent" conclusions based upon a non-testifying analyst's data and notes, are the relied-upon data and notes offered into evidence for their truth? Prior to *Smith*, many lower courts had said, "No," adopting the rationale of the plurality in *Williams*—i.e., that the underlying data and notes were offered to demonstrate the basis of the expert's opinion, but not for their truth. *See id.* at 789, fn. 2 (collecting cases). But the *Smith* Court rejected this view, holding that "[w]hen an expert conveys

10

an absent analyst's statements in support of his opinion, and the statements provide that support only if true, then the statements come into evidence for their truth." *Id.* at 783. And this was no narrow conclusion; the Court suggested that this rule would ordinarily apply when "an expert relays an absent lab analyst's statements as part of offering his opinion." *Id.*

{¶28} The facts of *Smith* help to illustrate the point. In *Smith,* one lab analyst tested substances suspected to be drugs, "documented her lab work and conclusions" in typed notes, and prepared a report. *Id.* at 790. But before the trial date, "the State called an audible," and asked a different expert to testify. *Id.* at 790. But this new expert had not participated in the drug testing. So, prior to trial, he reexamined the original, non-testifying analyst's "report and notes," so that he could testify to his own "independent opinion on the drug testing performed by" the non-testifying analyst. *Id.* at 790. The Supreme Court held that, by relaying information documented by the prior analyst and by relying upon her results to form his opinions, the testifying expert had effectively offered the non-testifying analyst's statements into evidence "for their truth." *Id.* at 798.

{¶29} Justice Kagan, now writing for a seven-justice majority, reasoned that whenever "an expert for the prosecution [1] conveys an out-of-court statement [2] in support of his opinion, and [3] the statement supports that opinion only if true, then the statement has been offered for the truth of what it asserts." *Id.* at 795. Restated even more simply, if "the truth of the basis testimony is what makes [the expert's testimony] useful to the prosecutor," then the "basis testimony" is hearsay for Confrontation Clause purposes. *Id.* The Court thus repudiated the view of the *Williams* plurality, and adopted instead the view of Justice Thomas and the dissenters that "'[t]here is no meaningful distinction between disclosing an out-of-court statement' to

'explain the basis of an expert's opinion' and 'disclosing that statement for its truth.'" *Id.*, quoting *Williams*, 576 U.S. at 106 (Thomas, J., concurring in judgment only).

{¶30} Under this rubric, the testifying expert in *Smith* had clearly offered the non-testifying analyst's statements for their truth. The testifying expert described what had occurred during the testing process—information he could have gleaned only by accepting the contents of the non-testifying analyst's report. *Smith*, 602 U.S. at 796-798. By building his firsthand opinion on secondhand information, he admitted the non-testifying analyst's statements into evidence through the backdoor. The testifying analyst "could opine that the tested substances were marijuana, methamphetamine, and cannabis only because he accepted the truth of what [the non-testifying analyst] had reported about her work in the lab—that she had performed certain tests according to certain protocols and gotten certain results." *Id.* at 798.

{¶31} So, what secondhand facts did the testifying expert offer for their truth? The Court specifically identified four types of basis information, the truth of which was necessary for the testifying expert's opinion to be useful: (1) the precautions the testing analyst took, (2) the standards she used, (3) the tests she performed, and (4) the results or data she generated. *See id.* at 800. Because such information is usually a prerequisite for the testifying expert's conclusions to be useful, it will nearly always come into evidence for its truth. In *Smith*, the testifying expert relied upon the statements of a declarant-analyst who "was not in the courtroom" for that information. Assuming those out-of-court statements were also "testimonial," they implicated the defendant's right to confrontation. *Id.* at 798.

{¶32} The Court's reasoning in *Smith* reached far beyond its prior holding in *Bullcoming*, that a surrogate expert could not relay the conclusions of a non-testifying analyst's testimonial report. *See Bullcoming*, 564 U.S. at 661. The Court accepted that

12

the testifying expert in *Smith* could have "independently" arrived at his opinion. *See Smith* at 798-799. But even if the testifying expert in *Smith* was not a mere "mouthpiece" for the non-testifying expert's conclusions, as was the case in *Bullcoming*, he nevertheless operated as a "mouthpiece" for their assertions regarding "the precautions (she [i.e., the non-testifying expert] said) she took, the standards (she said) she followed, the tests (she said) she performed, and the results (she said) she obtained." *Id.* at 800.

{¶33} Nor did it matter whether the materials the testifying expert had drawn on were the non-testifying analyst's formal report or her notes. In fact, the *Smith* Court could not tell which documents the testifying expert had relied upon at trial. *See Smith*, 602 U.S. at 801-802. But this uncertainty had no bearing on, and did not prevent the Court from resolving the hearsay prong of the Confrontation Clause inquiry. While the source of the statements "might, or then again might not, affect" the case's outcome, it would do so only under the *testimonial* prong of the inquiry. *Id.* at 802.

{¶34} And although the Confrontation Clause concerns only the admission of an out-of-court *statement*, its dictates cannot be evaded by omitting the prefatory "she said." The *Smith* opinion was concerned with the substance and source of the testifying expert's statements, not merely their form. Thus, under the hearsay prong, we must ask (1) whether the testifying expert's factual assertions were based on his personal knowledge or on information conveyed to him out of court, and (2) whether "the truth of the statements on which [the testifying] expert relied" went to the accuracy and credibility of the expert's scientific conclusions. *Id.* at 798.

{¶35} The hearsay prong of the clause applies just as much to *implicit* as *explicit* hearsay. To understand why, consider a hypothetical scenario: A lab technician performs procedure X on a sample, which yields numerical and

observational data. The technician then records those numerical and observational data in a written document along with the sentence, "These results were obtained after a correct and thorough application of procedure X, following standard operating procedures." The technician delivers this document to an expert who will prepare a final report and testify at trial, but who was not involved at any prior stage of the testing process. Now consider two different exchanges that might occur when that expert takes the stand:

*Exchange 1:*

Q. Did your lab test the sample using procedure X?

A. Yes, the technician told me that she tested the sample using procedure X.

Q. And did your lab follow standard operating procedures?

A. Yes, the technician said she followed standard procedures.

*Exchange 2:*

Q. Did your lab test the sample using procedure X?

A. Yes, the sample was tested using procedure X.

Q. And did your lab follow standard operating procedures?

A. Yes, standard procedures were followed.

{¶36} Both exchanges contain assertions that procedure X was performed and that standard operating procedures were followed. And *Smith* plainly teaches that, in both instances, those assertions are offered for their truth. *See Smith*, 602 U.S. at 797 (considering without distinction bald factual assertions and statements prefaced with phrases like "[a]ccording to the notes").

{¶37} Both exchanges also convey out-of-court statements. In Exchange 1, this is obvious; phrases like "the technician told me" and "the technician said" are dead

giveaways. In Exchange 2, however, the expert has conveyed the substance of the out-of-court statement without citing her source. But this failure of attribution does not alter the hearsay-prong analysis. What the expert knew and conveyed in Exchange 2 "came only from reviewing [the technician's] records"—no less so than the information the expert knew and conveyed in her less evasive Exchange 1 responses. *Id.* at 796.

{¶38} The *Smith* majority was also quick to note that experts could still testify in a variety of useful ways based on their personal knowledge and experience—even where they had no hand in the testing. If a testifying expert had been employed by the lab that had conducted the tests, the Court mused, they might testify as to "how th[e] lab typically functioned—the standards, practices, and procedures it used to test seized substances." *Id.* at 799. Or, if the expert had never worked in the particular lab at issue, then they could still speak to the "forensic guidelines and techniques" generally applied in such facilities. *Id.*

{¶39} To see how this could work, consider one more variation on the hypothetical above, in which the facts remain the same, but the testimony is as follows:

Exchange 3:

Q. When your lab tested the sample, did it use procedure X?

A. Whenever we receive samples like this, our normal process is to test them using Procedure X. I have no reason to believe that is not what occurred here.

Q. But you do not know specifically that procedure X was performed here?

A. I have no personal knowledge regarding what the lab did when it received this particular sample.

In this version of the exchange, the testing expert is still offering her assertions for their truth, but she does not rely on any out-of-court statements in doing so. Because she works in the lab, she has personal knowledge of its ordinary procedures, and she has no information that would lead her to believe others in the lab had deviated in this case. The expert's lack of personal knowledge regarding the testing procedures applied in this case is just as clear here as in Exchange 1 (the technician-told-me exchange), but this new scenario introduces no hearsay into the record.

{¶40} Finally, the *Smith* Court noted that an expert witness "might have been asked—and could have answered—any number of hypothetical questions, taking the form of: '*If* or *assuming* some out-of-court statement were true, what would follow from it?'" (Emphasis in original.) *Smith*, 602 U.S. at 799. But the State cannot use this to end-run the Confrontation Clause by reading lab results in the form of a question, then eliciting the expert's opinion. In order for such testimony to be relevant, and therefore admissible under Evid.R. 402, the State must "separately prove the thing assumed." *Id.*

2.

{¶41} At Hale's trial, the State presented the reports and testimony of two experts, Katherine Dailey and Logan Schepeler. The first two reports were signed by Dailey, while the third was signed by Schepeler. These reports contained few details and little data—they primarily listed the evidence tested, the type of testing kits used, and the experts' conclusions. Nothing in the record suggests that conclusions included in the reports came from anyone other than the reports' authors.

{¶42} According to Dailey's and Schepeler's testimony, neither analyst performed the physical testing procedures on the samples discussed in the reports. BCI employs a "teamwork approach," Schepeler testified, in which "different qualified

16

analysts" perform the different tasks "at each step of the process." Dailey and Schepeler constituted the final links in this teamwork chain, and therefore they would not necessarily have been involved in the physical testing.

{¶43} Instead, testimony revealed that Dailey and Schepeler were responsible for drawing final analytic conclusions and drafting reports. Schepeler testified that "at every step there are notes that are taken by the analyst" who performed that particular step. Both experts' testimony suggest that a reviewing analyst at the end of the chain (like Dailey or Schepeler) would then "receive[] the data" and "review[] all of those notes" from the prior analysts, before "mak[ing] comparisons between the evidence and DNA from individuals to see if the individuals contributed the DNA to the evidence samples." When all is said and done, these final-leg analysts would "prepare a report with results" based on the conclusions they drew from the notes and data they received.

{¶44} On the stand, both Dailey and Schepeler were candid about the fact that they were involved only in the final-step analysis, not the hands-on laboratory testing. Dailey averred that she "did not handle these items of evidence" (i.e., the rape kit and the sample swab from David Hale), but merely "received the data that was generated from" them. Schepeler testified similarly, stating that he "did not physically handle the rape kit," and that, although he was "the final person" who was "doing analysis in the case, that doesn't necessarily mean that [he] was physically handling the items." On cross-examination, counsel asked Schepeler, "So you didn't do the test?" Schepeler replied, "I was not in the laboratory," and agreed that he was essentially removed from the process of testing the materials:

> Q. Okay. So basically the test was done by somebody else, the
>
> data that was derived from that test was given to you and you analyzed

it.

A. That's correct.

Q. So you don't know how that test was performed—well, strike that. You probably know how it was performed, but you didn't do it?

A. That's fair.

{¶45} At the close of the State's case, Hale objected to the admission of Dailey's and Schepeler's DNA testing reports on Confrontation Clause grounds. Hale's counsel asserted that there was "no way to determine the validity of the test because the individual who did the test results is not available for cross-examination."[2] The court overruled this objection and admitted all three reports.

{¶46} In his brief to this Court, Hale seizes on Dailey's and Schepeler's statements, claiming that Dailey and Schepeler were "surrogate analysts," who testified "to the content of the report authored by the absent analyst." But the State contests this characterization of Dailey's and Schepeler's roles. The State concedes that "there were other analysts involved in the process of testing C.H.'s rape kit" and that Dailey and Schepeler "did not personally handle the physical contents of the kit." However, it asserts that the experts nevertheless "conducted the comparison testing

---

[2] The parties argued below over whether Hale's Confrontation Clause objection fell within a stipulation his counsel made not to challenge the chain of custody of the DNA evidence. The record suggests, however, that when Hale's counsel made that stipulation, he did not know about BCI's "teamwork approach" to DNA testing, and had believed the reports' drafters had performed the physical testing. Indeed, Hale's counsel, on the record, explained that he had told the State, "As long as the tech who did the test is here to testify, I don't have a problem." Although the trial court gestured at this dispute, it rejected Hale's Confrontation Clause claim on its merits, believing "that the defense was able to cross-examine the persons that were qualified under the confrontation clause in *Crawford versus Washington*." At oral argument before this court, the State again tried to argue that Hale had stipulated away his right to demand the testing analysts come forward. But the State has waived that argument on appeal by choosing not to reference the stipulation or raise the issue of waiver in its discussion of any assignment of error in its brief. The State's only mention on this point comes as a cursory reference to the events below in its statement of facts. The State may not elect to forego such a weighty and fact-intensive issue in its brief, at which time Hale might have briefed an appropriate reply, then surprise Hale by resuscitating the issue at oral argument.

establishing—and authored the reports memorializing—the respective matches between Defendant's DNA profile and that of the biological material found on C.H.'s breast and labia." In other words, Dailey and Schepeler reviewed information gathered from physical testing performed by others, in order to reach a conclusion regarding the likelihood that the samples came from the same donor.

{¶47} Hale's characterizations of the DNA reports and testimony are overstated. As discussed, there is no reason to think Schepeler and Dailey were simply parroting another expert's *conclusions*. By all accounts, their statements fell well outside the *Bullcoming* fact pattern. While Dailey and Schepeler compared and analyzed notes and data from other analysts, they appear to have reached independent and original conclusions.

{¶48} But distinguishing *Bullcoming* is a necessary, not a sufficient condition in the Confrontation Clause analysis. We must still consider whether Dailey and Schepeler—either in their reports or in their testimony—relayed or relied upon out-of-court statements, and whether those statements were offered for their truth. Based on the descriptions above, we conclude that Dailey and Schepeler did so in two ways: (a) by making factual assertions regarding what procedures were performed and what precautions were followed without personal knowledge, and (b) by using underlying data, derived from those same laboratory tests, as the basis for their conclusions. We address each category in turn.

*a. Assertions Regarding Process & Procedure*

{¶49} Dailey and Schepeler both made factual assertions about the testing performed on the samples in this case and about the precautions taken in the lab. The record suggests that neither Dailey nor Schepeler had firsthand knowledge of what had gone on in the lab. Therefore, to prepare their final reports and to answer

questions about these topics on the stand, both experts relied on the notes, reports, and comments of those who *had* been present for the testing. And because the value of Dailey's and Schepeler's testimony turned, at least in part, on whether those out-of-court communications were accurate, Dailey and Schepeler were offering those statements for their truth.

{¶50} At trial, Dailey testified in detail about the "four step process" by which BCI performs DNA analysis, including (1) extraction, "where DNA is removed from the item," (2) "quantification," in which the analysts "determine how much DNA was on that item," (3) "amplification," involving the production of "millions of copies of certain regions of the DNA profile," and finally (4) electrophoresis, in which analysts "take a picture of the DNA profile." On the stand, Dailey asserted that "both of those items [i.e., the ones listed in her report] underwent that four step process." Schepeler's on-the-stand testimony was more cautious. When asked whether a particular sample "was put in for a further DNA analysis," Schepeler responded, "My report addresses STR and YSTR results for the Item 1.9." And instead of expressly describing the types of DNA testing done in this case, Schepeler describes only the "two different types of DNA testing referenced in my report."

{¶51} But in the written reports, which were admitted into evidence, both experts made direct factual assertions regarding the types of testing performed. For example, Dailey's first report noted that "an alternate light source was used to assist in detection of stains" and that "DNA profiling was performed using PCR with the GlobalFiler® STR on samples from" the rape kit. Dailey's second report made similar assertions regarding the retesting. And Schepeler's report, which contained the results from testing the external vaginal swab, noted that "DNA profiling was performed using

PCR with the Globalfiler® and Yfiler Plus® STR kits."[3]

{¶52} In addition to the procedures used, Dailey also spoke to the precautions taken in handling the samples. When counsel asked Dailey, "[D]id you take all the appropriate precautions that you've already testified to to [sic] prevent any kind of cross contamination," Dailey replied, "Yes." These "precautions" included, according to Dailey, "[g]loves, lab coat, masks, multiple different items of personal protective equipment." But, as noted, Dailey said that she "did not handle these items of evidence," but merely "received the data that was generated from these items." Therefore, Dailey's testimony regarding precautionary measures could only have referred to the precautions taken by *others* while *they* performed procedures for which she was not present.

{¶53} Schepeler once again proved more circumspect in his responses, testifying only to BCI's ordinary precautionary procedures, but never expressly stating whether those precautions were taken while testing the samples in this case. For example, when asked "[w]hat kind of precautions" the lab took "when testing physical evidence that's taken into custody," Schepeler responded that "[e]ach item is tested separately," and that "gloves are worn at all times" and "are very routinely changed, always changed in between working different items of evidence."

{¶54} According to their testimony, Dailey and Schepeler were not present for

---

[3] It is clear from the reports and testimony that both GlobalFiler and Yfiler Plus are particular "STR kits," or kits that allow analysts to perform "short tandem repeat" ("STR") type testing. STR testing is "human specific testing" and comes in at least two forms—normal STR testing, which is what BCI performs in "all of [its] DNA cases," and YSTR testing, which is "male specific testing." One of the steps in DNA testing involves quantifying and selectively amplifying DNA on the sample through a procedure called "polymerase chain reaction" ("PCR"). STR tests of both types allow DNA analysts to generate a profile (or profiles) from a tested sample, which they can then compare to the profiles generated from other samples. If both samples prove adequate for comparison, then the analysts may make a determination that one of the profiles (drawn from the evidence) is consistent or inconsistent with the other (drawn from the suspect), and may calculate the statistical likelihood that a random, unrelated individual's profile would exhibit the same similarities.

the physical testing process, and therefore lacked personal knowledge regarding "the precautions [the technicians] took, the standards [the technicians] followed, [or] the tests [the technicians] performed." *See Smith*, 602 U.S. at 800. Their descriptions of the testing process, therefore, must have relied either upon Dailey's and Schepeler's general expectations and knowledge of lab procedure, or else upon statements from those who performed the testing. Where Dailey and Schepeler did the former—where they testified only as to BCI's usual procedures—they were permissibly "testify[ing] from personal knowledge about how that lab typically functioned." *See id.* at 799. This was the case, for example, when Schepeler described the precautions BCI technicians ordinarily take to prevent cross-contamination. Such testimony from personal knowledge did not implicate the hearsay prong of the Confrontation Clause.

{¶55} But where Dailey and Schepeler made factual assertions in their reports or testimony regarding what actually transpired in the lab, they spoke without personal knowledge. According to their own testimony, they both reviewed the detailed notes of other technicians to know what had transpired in the lab. Thus, when Dailey and Schepeler asserted that certain tests were, in fact, performed and certain procedures were followed during the physical testing, they relayed the substance of the non-testifying analysts' out-of-court statements. And because the relevant out-of-court statements supported Dailey's and Schepeler's "opinion[s] only if true," *see id.* at 795, they were being offered for their truth.

{¶56} Consider, for example, the statement in Schepeler's report that "DNA profiling was performed using PCR with the Globalfiler® and Yfiler Plus® STR kits on a sample from" the external vaginal swab. While Schepeler may have assumed this was true—indeed, this may be standard procedure—he could only have known for sure by consulting notes from his colleagues. But what if those notes were wrong? What if the

PCR test had been done with a *different* kit, one known to yield wild errors? Or with the wrong kit, so that the results were meaningless? Or what if the tests were not performed at all? The usefulness of Schepeler's expert opinions depended upon the answers to these questions, but Schepeler had to trust in the truth of the statements of others for those answers. His report therefore relied upon out-of-court statements when it stated that the "DNA profiling was performed using" the given kits. And because the prosecution wanted the jury to believe the right test had been performed, those statements were offered for their truth. *See Smith* at 798 (noting that the testifying expert "could opine that the tested substances were marijuana, methamphetamine, and cannabis only because he accepted the truth of what [the out-of-court analyst] had reported about her work in the lab—that she had performed certain tests according to certain protocols and gotten certain results"). If this and similar hearsay statements are also "testimonial," then they are barred by the Confrontation Clause.

### b. *Use of Laboratory Test Results & Data*

{¶57}  Schepeler and Dailey also relied upon out-of-court statements for the data underlying their conclusions. These data were generated by non-testifying technicians and relayed to Dailey and Schepeler, who built their expert opinions on them. Because the underlying data conveyed to Dailey and Schepeler were integral to the jury believing Dailey's and Schepeler's opinions, these data were embedded in the experts' conclusions and were admitted "for their truth."

{¶58}  At trial, both Dailey and Schepeler testified to being the final step in BCI's DNA-analysis chain. They relied upon the data generated from all the prior links in that chain. Hence, Dailey testified that her "job at the end" was "to take all of that data and look at those pictures [i.e., the electropherograms] and compare them side

by side and see if they are similar or dissimilar," to identify the likelihood of a DNA match. As noted earlier, Dailey "did not handle" the evidence, but "received the data that was generated from these items."

**{¶59}** Schepeler likewise relied upon lab results and data generated by others. Like Dailey, he testified that he was the final link in the chain. Schepeler later explained his reliance upon data generated by others:

Q. So at what point do you pick it up and it becomes yours, in your possession and your part of the chain of custody.

A. I would basically be the last step of the entire process, which is analyzing the data that's generated from the testing.

Q. So you didn't do the test?

A. I was not in the laboratory.

Q. Okay. So basically the test was done by somebody else, *the data that was derived from that test was given to you* and you analyzed it.

A. That's correct.

(Emphasis added.)

**{¶60}** Dailey's and Schepeler's opinions were based upon data provided to them by technicians or analysts in a series of out-of-court statements—whether those "statements" were communicated in the form of graphs, computer files, images, charts, or notes. When Dailey and Schepeler then used those test results as the basis for the opinions in their reports and on the stand, they implicitly offered those out-of-court statements into evidence.

**{¶61}** The accuracy of that underlying data was crucial to the State's case. If the jury learned that the non-testifying analyst were a chronic drunk at his workplace,

or that his data had been wrong in every other case, or that he had a decades-long personal vendetta against Hale, it would throw the testifying experts' conclusions out the window. Accurate underlying data are a prerequisite to a usable expert opinion—whether those data are express or implied.

{¶62} Under *Smith*, because the out-of-court statements regarding the test results formed the substantive basis for the testifying experts' conclusions, those out-of-court statements were being submitted "for their truth." If Dailey's and Schepeler's opinions were to be of any use to the prosecution, the quality of the data provided to them was critical. The underlying data constituted "basis evidence," used to generate an expert opinion; and a bad basis means a useless expert. "If believed true, that basis evidence will lead the jury to credit the opinion; if believed false, it will do the opposite." *Smith*, 602 U.S. at 796. However, because Hale was not "confronted with" the analysts who *generated* that data, he had "no opportunity to challenge the veracity of the out-of-court assertions that are doing much of the work." *Id.* at 796.

## B. The Testimonial Prong

### 1.

{¶63} Hearsay violates the Confrontation Clause only if the hearsay statements were *also* testimonial. *Id.* at 800 ("To implicate the Confrontation Clause, a statement must be hearsay ('for the truth') and it must be testimonial . . . ."). While *Smith* addressed and applied the hearsay prong in detail, it left the testimonial prong for the lower courts on remand. *Id.* at 801. The Court noted, however, that the testimonial analysis *may* differ, depending on whether the statements came from the non-testifying analyst's notes or from their report. The Court did not say whether one, neither, or both of these sources would make the statements testimonial—"only that before the court can decide the primary purpose of the out-of-court statements

introduced at Smith's trial, it needs to determine exactly what those statements were." *Id.* at 802.

{¶64} To determine whether a given statement is "testimonial" for purposes of the Confrontation Clause, a court must (1) "identify the out-of-court statement introduced," and then (2) "determine, given all the 'relevant circumstances,' the principal reason [the statement] was made." *Id.* at 800-801, quoting *Michigan v. Bryant*, 562 U.S. 344, 369 (2011). For at least a decade, Ohio courts have applied a primary-purpose test much like the Court described in *Smith. Compare State v. Maxwell*, 2014-Ohio-1019, ¶ 40, *with Smith* at 802. To determine whether a statement's primary purpose was to provide testimony, Ohio courts ask whether the declarant would "have reasonably believed that the statement would be available for later use at trial[.]" *Terry*, 2024-Ohio-2876, at ¶ 24 (1st Dist.), quoting *State v. Beasley*, 2018-Ohio-493, ¶ 18; *accord State v. Tench*, 2018-Ohio-5205, ¶ 212.

{¶65} We hold that pursuant to *State v. Tench*, 2018-Ohio-5205, the statements made by the non-testifying BCI analysts and relied on by the testifying analysts, Dailey and Schepeler, in rendering their opinions qualify as testimonial.

{¶66} In *Tench*, the Ohio Supreme Court held that records from a state forensic laboratory analyst regarding an "examination . . . conducted to establish past events potentially relevant to later criminal prosecution" are "testimonial." *Id.* at ¶ 216. In that case, one BCI fingerprint examiner (Limpert) performed the initial "processing" of some physical evidence. *Id.* at ¶ 207. In doing so, Limpert applied chemicals used for fingerprint analysis, then rendered an opinion and report. *Id.* at ¶ 208. A second examiner (Keaton) then stepped in to testify at trial. *Id.* at ¶ 206. Keaton prepared her own report after reviewing Limpert's report and notes and "performing her own visual examination of the exhibits" processed by Limpert. *Id.* at

¶ 207 and 209. At trial, Keaton testified that "Limpert [had] applied certain chemicals to the exhibits," even though Keaton "did not claim to have personally observed" her do so. *Id.* at ¶ 211. Keaton further testified that she found no usable fingerprint ridges on any exhibits and that "there was no conflict between Limpert's findings and her own." *Id.* at ¶ 209 and 207.

{¶67} After concluding that Keaton's testimony had contained out-of-court statements, the *Tench* court turned to "whether Limpert's out-of-court statements were 'testimonial' as that term is used in *Crawford* and its progeny." *Tench*, 2018-Ohio-5205, at ¶ 211. First, the Court rejected the State's proposed "targeted-individual test," drawn from the plurality opinion in *Williams*. *Id.* at ¶ 214-215. The Court applied the broader primary-purpose test it had employed in *Maxwell*, which asked whether an objectively reasonable declarant would have anticipated that their statements would be used as evidence at trial. *Id.* at ¶ 212. The answer to this question was obvious—what else would a declarant expect when "a law-enforcement officer provide[s] evidence to a state laboratory set up for the purpose of assisting police investigations"? *Id.* at ¶ 213.

{¶68} BCI is statutorily in the business of assisting law-enforcement in the investigation and prosecution of crime. *See id.*, quoting R.C. 109.52 ("BCI may operate a criminal-analysis laboratory and 'engage in such other activities as will aid law enforcement officers in solving crimes and controlling criminal activity'"). This distinguished the court's holding in *Tench* from its holding in *State v. Maxwell*, where it had held that autopsy reports from a coroner's office were *not* testimonial in nature. *Maxwell*, 2014-Ohio-1019, at ¶ 57. Such reports differ from a BCI forensic analysis because, "[a]lthough autopsy reports are sometimes relevant in criminal prosecutions, . . . they are not created primarily for a prosecutorial purpose." *Id.* at ¶ 59. Rather,

27

coroners conduct and report their autopsies "'for the primary purpose of documenting cause of death for public records and public health.'" *Id.* at ¶ 57, quoting Carolyn Zabrycki, Comment, *Toward a Definition of "Testimonial": How Autopsy Reports Do Not Embody the Qualities of a Testimonial Statement*, 96 Cal.L.Rev. 1093, 1130 (2008). Further, unlike the clear, law-enforcement and evidentiary objectives in BCI's enabling statutes, the Revised Code sets forth a multiplicity of public-health related reasons to perform an autopsy. *Id.* at ¶ 58, citing various provisions of R.C. Ch. 313.

{¶69} Indeed, the fingerprint analysis in *Tench* was performed solely to determine "whether Tench left fingerprints on items of evidence connected to the victim's body, her house, or the vehicle in which the body was found." *Tench* at ¶ 216. Any reasonable person would understand that statements made regarding results and procedures during the BCI process were likely to be used in a subsequent proceeding.

2.

{¶70} Just like the testifying expert in *Tench*, Dailey and Schepeler relied upon statements and data provided and prepared by non-testifying BCI analysts. *See Tench*, 2018-Ohio-5205, at ¶ 207-209. We have already identified these statements, which communicated what tests were performed and what precautions taken, as well as the results derived from the physical testing. Under *Tench*, all of these out-of-court statements were testimonial.

{¶71} Although the out-of-court analysts in this case may not have crafted trial-ready reports for Dailey and Schepeler, they nevertheless documented their notes, comments, and findings "under circumstances that would lead an objective witness to reasonably believe that the statement would be available for use at a later trial." *See Tench* at ¶ 212, citing *Maxwell*, 2014-Ohio-1019, at ¶ 35. As in *Tench*, the analysts at BCI tested the samples after "a law-enforcement officer provided evidence

to a state laboratory set up for the purpose of assisting police investigations." *Id.* at ¶ 213. They then communicated their results to testifying experts—Dailey and Schepeler. Under controlling Ohio caselaw, because the non-testifying BCI technicians' "examination of the exhibits was conducted to establish past events potentially relevant to later criminal prosecution," their "statements about that examination were testimonial." *Id.* at ¶ 216.

{¶72} When a BCI analyst communicates the results of her tests and the details of her procedure to another expert, who will then author a report, the non-authoring analyst *must* know that the substance of her statements is likely to make its way into a future prosecution. Indeed, that is the primary reason her lab and her job exist. Therefore, under the rule set forth in *Tench*, the notes taken and data produced by the non-testifying team members at BCI were "testimonial." Where the substance of those out-of-courts statements came into evidence for its truth and without confrontation, the State violated the Confrontation Clause.

## C. Conclusion & Harmless Error

{¶73} The State introduced the expert reports and opinion testimony of Schepeler and Dailey against Hale. Yet Schepeler and Dailey relied upon the notes and data communicated by others to relay what transpired in the lab and to generate their expert conclusions. Therefore, under *Smith*, the notes and data constituted out-of-court statements offered for their truth. And under *Tench*, because those notes and data came from BCI at the behest of law enforcement, those statements, notes, and data were also testimonial. The analysts and technicians who wrote those notes and transmitted those data became "witnesses against" Hale. Hale therefore had a constitutional right to be confronted with those witnesses, not merely the experts who generated the ultimate conclusions. The trial court erred by ruling otherwise.

{¶74} Ordinarily, a Confrontation Clause violation would be subject to harmless-error analysis under Crim.R. 52(A). *See State v. Smith*, 2019-Ohio-3257, ¶ 14 (1st Dist.). In this case, however, the State has *both* waived *and* conceded any harmless-error argument in this case.

{¶75} The State waived harmless error by failing to provide any argument to that effect in its brief. It is the State's burden to demonstrate harmlessness beyond a reasonable doubt. *See State v. Wilcox*, 2023-Ohio-2940, ¶ 24 (1st Dist.).

{¶76} But even if the harmless-error issue were not waived in the briefs, the State unequivocally conceded the point at oral argument, in the following exchange:

Q. One last question on the DNA. I noticed that you didn't really make a harmless error argument in your brief on the DNA—um, because you're just focusing on the fact that it was admissible properly but, if we were to disagree with you, would it be harmless?

A. I—I guess that, uh, [Hale's counsel] and I agree on three things, because I don't believe that's harmless—at least not in the context of this case.

. . .

Q. So you would—you would agree that if it—if it improperly came in, it wouldn't be harmless?

A. Absolutely not harmless, no.

Thus, even assuming that the State had not waived its harmless-error argument, we accept its concession.

{¶77} For these reasons, we sustain Hale's third assignment of error. And because the resolution of Hale's third assignment of error requires us to reverse his convictions, Hale's remaining assignments of error are rendered moot and we do not

address them. *Compare Wilcox*, 2023-Ohio-2940, at ¶ 24 (1st Dist.).

* * *

**{¶78}** Hale's trial was plagued with numerous evidentiary problems—many of which the State concedes—that we do not address today. Instead, we resolve this case with a straightforward application of the Supreme Court's decision in *Smith* and hold that forensic experts may not rely upon testimonial, out-of-court statements to form the basis for their conclusions or to explain what transpired in the lab. When such statements, which support an expert's conclusions only if true, come in at trial, they come in for their truth. And when the offending statements come out of a crime lab working at the behest of law enforcement, they are also testimonial.

**{¶79}** Because Dailey's and Schepeler's testimony and reports contained the substance of statements that fit both criteria, and because the underlying declarants were not made available for cross-examination, Hale's rights under the Confrontation Clause were violated. The trial court should have excluded or struck Dailey's and Schepeler's reports, along with crucial portions of their testimony.

**{¶80}** For the foregoing reasons, we overrule Hale's first assignment of error, sustain his third assignment of error, and decline to address his remaining assignments of error as moot. Hale's convictions are therefore reversed, and the cause is remanded for a new trial.

Judgment reversed and cause remanded.

**BOCK, P.J.,** and **ZAYAS, J.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.