[Cite as *State v. Tarver*, 2025-Ohio-1190.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 23AP-640 |
| | | (C.P.C. No. 22CR-1549) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Manning Tarver, | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on April 3, 2025

**On brief:** [*Shayla D. Favor*], Prosecuting Attorney, and *Benjamin Tracy*, for appellee.

**On brief:** *Carpenter Lipps LLP*, *Kort Gatterdam*, and *Michael Rogers*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

DINGUS, J.

{¶ 1} Defendant-appellant, Manning Tarver, appeals from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas pursuant to a jury verdict finding him guilty of two counts of rape. For the reasons that follow, we affirm the judgment of the trial court.

## I. Facts and Procedural History

{¶ 2} In April 2022, a grand jury indicted Tarver on two counts of rape, first-degree felony violations of R.C. 2907.02, and one count of gross sexual imposition, a fourth-degree felony violation of R.C. 2907.05. Plaintiff-appellee, State of Ohio, accused Tarver of sexually assaulting D.W. while she was working as a dancer at the X Gentlemen's Club. Tarver pleaded not guilty to the charges, and the cause proceeded to a jury trial.

{¶ 3}    At trial, the state presented the testimony of D.W. and Michelle Ross, a sexual assault nurse examiner.  The defense presented the testimony of Detective Joel Vogel, the primary investigator of the incident, and Chelsy Houseworth, a former dancer at the X Gentlemen's Club, who was working at the club on the night in question.

### A. The State's Case in Chief

{¶ 4}    D.W. testified that she was 18 years old when she was hired as a dancer at the X Gentlemen's Club at the end of September 2021.  She worked her first shift the same day she was hired.  At the end of that shift, Tarver asked D.W. for a lap dance.  She declined because she was leaving the club and was already in her street clothes.  On D.W.'s second day of work, Tarver approached her and asked for a dance in a private room.  D.W. agreed.  A security guard led D.W. and Tarver to the VIP area and chose a room for them towards the back.

{¶ 5}    When Tarver and D.W. entered the private room, Tarver licked her breast.  The two sat down, and Tarver asked if D.W. wanted to have sex with him.  She said no.  He replied that she could not tell him no because he had already paid the security guard $100 to have sex with her.  D.W. said she could continue with the dance but would not have sex with him.  He rubbed her crotch with his hand.  After Tarver continued to request sex, D.W. turned around to leave the private room.  Then, as D.W. tried to walk away, Tarver grabbed her in a bear hug and sat back down with her on his lap.  By that point, Tarver's penis was out, and he began to have vaginal intercourse with D.W. while she was on his lap, her underwear pulled aside.  D.W. testified that she did not see when Tarver pulled his penis out, and did not know exactly when he did so.

{¶ 6}    D.W. repeatedly told Tarver that she did not want to have sex with him, and physically struggled enough to push herself off of him at one point.  Once she managed to get off of him, he pulled her back onto his lap and penetrated her again.  He told her that she was not allowed to stop because his "songs weren't over yet."  (Aug. 1, 2023 Tr. Vol. 2 at 237.)  After Tarver finished or otherwise stopped having sex with D.W., he threw money on the floor in the room and walked out.  D.W. testified that she had not shouted or screamed because she was scared and in a state of shock.  She left the VIP area and sat at the bar to count the money, still feeling "blank" and in shock.  *Id.* at 245.

{¶ 7} D.W. went from the bar to the locker room and started crying. The security guard, the bar owner, and several dancers came into the locker room to figure out what was wrong, and D.W. told them she had been raped. D.W. testified that none of them seemed to care, and the dancers acted as though such a thing "was supposed to happen." *Id.* at 189. She testified that the dancers were angry with her for making such an allegation because they had sex with patrons for money and knew they could get fired for doing so.

{¶ 8} D.W. left the club and went directly to the hospital. D.W. talked to a sexual assault nurse examiner, as well as a police detective, and she underwent a physical examination. D.W. testified that she did not return to the club at any point, as she would never feel safe at a place where a security guard could essentially sell her for $100 and look the other way.

{¶ 9} On cross-examination, the defense asked D.W. about her statements to the detective and nurse and contrasted those statements with D.W.'s testimony at trial. D.W. acknowledged that she did not tell the nurse that she was facing away from Tarver when he had sex with her. According to the nurse's report, D.W. said that Tarver used lubrication during sex, but D.W. stated more recently that no lubrication was involved. D.W. told the detective that she and Tarver were in the private room for six minutes, but on the stand, she could not remember how much time passed while they were in the room. D.W. acknowledged that when she declined Tarver's request for a lap dance on her first night, Tarver did not get aggressive.

{¶ 10} Michelle Ross testified that she was the sexual assault nurse examiner on call when D.W. came to the hospital. Ross physically examined D.W. and wrote down D.W.'s account of what happened. Ross read D.W.'s statement into the record:

> I was sitting down and he came up to me and wrapped his arms around my shoulders and asked me for a dance. And then we went back into the room. Everything was ok for the first couple of minutes. And then he told me that he paid my manager $100 to have sex with me. And then he started touching me on my vagina . . . not inside . . . with his fingers. And then he unzipped his pants and told me to just let him do it. And I told him, no, that is not what I do. And he told me I couldn't tell him no because he had already paid for me. And then he pulled his penis out and put it inside me . . . inside my vagina . . . and then I told him I wanted him to stop multiple times. He told me I

wasn't allowed to. And then he told me I was going to be his bitch forever. He kept telling me for a while that he talked to Mark, my manager, and that I wouldn't be in trouble. He made me get off of him in a way that the cameras wouldn't be able to see his penis was out. And then he handed me money and that was the end. And then I went and told the girls what happened. They got the manager, and he got kicked out. And then I left and came to the emergency room.

(Tr. Vol. 2 at 260-61.) During the physical exam, Ross noted three small bruises inside D.W.'s labia minora, near her urethra.

{¶ 11} During cross examination, the defense displayed the narrative statement and asked questions about possible inconsistencies and omissions from the statement. Ross agreed that there were differences between certain statements and D.W.'s trial testimony. For example, D.W. testified that she did not know how or when exactly Tarver pulled his penis out, but D.W.'s statement indicates that Tarver unzipped his pants. D.W. testified her back was to Tarver but the statement does not reflect the direction D.W. was facing. D.W. testified that Tarver threw money on the ground, but the statement indicates that Tarver handed money to D.W. The statement does not reflect D.W.'s testimony that she counted the money at the bar afterward.

{¶ 12} At the end of the state's case in chief, it presented a joint stipulation that Tarver voluntarily appeared at the police department, provided a statement, and consented to the collection of a DNA sample. The parties further stipulated that Tarver was the presumed contributor to the DNA collected from D.W. The state offered Ross's notes, including D.W.'s narrative statement, into evidence with no objection from the defense.

{¶ 13} Tarver moved for partial acquittal under Crim.R. 29. The defense conceded that sufficient evidence supported the two rape counts but argued that the state had not presented sufficient evidence of gross sexual imposition. The state argued that Tarver's act of touching D.W.'s crotch, coupled with his statement that he had already paid $100 for sex, satisfied the elements of gross sexual imposition. The trial court denied the Crim.R. 29 motion.

## B. Tarver's Case in Chief

{¶ 14} The defense brought Detective Joel Vogel to the stand to describe the investigation process in Tarver's case. Vogel testified that he interviewed D.W. at the hospital before the sexual assault nurse examined her, and he interviewed her by telephone approximately three months later. Tarver voluntarily came to Vogel for an interview and consented to a DNA swab.

{¶ 15} Vogel described his unsuccessful efforts to get information from one of the dancers, who did not answer or return Vogel's calls. He acknowledged that he did not interview the owner or any other employees of the X Gentlemen's Club, and he decided not to track down other potential witnesses. Vogel stated that he already knew that others working in the club on the night in question did not see or hear what happened between Tarver and D.W. in the private dance room. Because he believed that they were unlikely to have any relevant information, Vogel decided not to focus his time on finding those witnesses or convincing them to talk to him or share information.

{¶ 16} Chelsy Houseworth testified that she was a dancer at the X Gentlemen's Club for two years, and that she was at the club on the night in question. Earlier in the evening, as Houseworth was sitting at the bar, Tarver asked Houseworth for a private dance. Houseworth initially agreed, but when Tarver asked her to also have sex with him, she said no and declined to dance for him. She noted that Tarver did not get mad at her refusal and continued to talk with her at the bar for a while. Later that night, Houseworth saw Tarver and D.W. coming out of the VIP area. She said that D.W. was smiling, and that she sat at the bar counting her money for 45 minutes. Houseworth testified that Tarver was a regular customer at the club, and that he would regularly request private dances and sex from dancers. When D.W. was crying in the locker room, she said that she and most of the dancers thought D.W. was lying "[b]ecause everyone knew what [Tarver] wanted when he came in." (Tr. Vol. 3 at 387.)

{¶ 17} The jury found Tarver guilty on both counts of rape, and not guilty of gross sexual imposition.

{¶ 18} At sentencing, the state and the defense agreed that the two rape counts were not allied offenses subject to merger. The state noted that each count carried a mandatory prison term of three to eleven years, with an indefinite tail of 50 percent of the base term

under the Reagan Tokes Law, R.C. 2929.144(B)(1). The defense argued that the trial court should impose minimum, concurrently run sentences because, among other things, the two offenses were separated by mere seconds. The trial court imposed indefinite prison terms of six to nine years on each count, to be served concurrently.

{¶ 19} Tarver filed a timely notice of appeal. The state filed a notice of cross-appeal, but it has failed to prosecute its appeal. We therefore dismiss the state's cross-appeal and proceed to the merits of Tarver's appeal.

## II. Assignments of Error

{¶ 20} Tarver assigns the following three assignments of error for our review:

> [I.] The trial court violated appellant's rights to due process and a fair trial when it entered a judgment of conviction based on insufficient evidence and against the manifest weight of the evidence in violation of appellant's rights under the United States and Ohio Constitutions.
>
> [II.] When jury verdicts indicate that they are the product of arbitrariness and irrationality, appellant is deprived of the right to a fair and impartial jury and to due process of law contrary to the Ohio and United States Constitutions.
>
> [III.] The trial court erred in admitting the alleged victim's narrative statement to the forensic nurse examiner thereby violating appellant's rights to due process and to a fair trial as guaranteed by the United States and Ohio Constitutions.

## III. Analysis

### A. Sufficiency and Manifest Weight of the Evidence

{¶ 21} In his first assignment of error, Tarver primarily asserts that his rape convictions were against the manifest weight of the evidence. Within the same assignment of error, Tarver also purports to challenge the sufficiency of the evidence supporting his convictions, though the substance of his argument relates to the merger of allied offenses rather than sufficiency of the evidence.

### 1. Sufficiency

{¶ 22} A sufficiency analysis tests " 'whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.' " *State v.*

*Thompkins*, 78 Ohio St.3d 380, 386 (1997), quoting *Black's Law Dictionary* (6th Ed. 1990).  When we review a challenge to the sufficiency of the evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

**{¶ 23}** The jury convicted Tarver of two counts of rape, in violation of R.C. 2907.02. The relevant portion of that statute provides that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."  R.C. 2907.02(A)(2).  The statutory definition of "[s]exual conduct" includes "vaginal intercourse between a male and female."  R.C. 2907.01(A). R.C. 2901.01(A) defines "[f]orce" as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing."

**{¶ 24}** D.W. testified that after she told Tarver she would not have sex with him, he physically restrained her and engaged in vaginal intercourse.  After D.W. physically resisted and was able to get off of Tarver at one point, Tarver again physically restrained D.W. and engaged in vaginal intercourse.  D.W.'s testimony established all of the necessary elements of rape under R.C. 2907.02(A)(2).  In fact, defense counsel conceded during the Crim.R. 29 motion that the foregoing testimony was sufficient to support his rape convictions.  In his appellate brief, Tarver presumes that the evidence was sufficient, but he argues that the two rape counts should have merged into a single offense for purposes of sentencing under R.C. 2941.25.  Accordingly, Tarver's purported sufficiency argument is actually an allied-offenses argument.

**{¶ 25}** Tarver has not presented a distinct assignment of error alleging that the trial court erred in failing to merge Tarver's two rape counts for purposes of sentencing.  An appellate court's role is to rule on assignments of error, not mere arguments. *Coffman v. Mansfield Corr. Inst.*, 2009-Ohio-5859, ¶ 18 (10th Dist.).  Even if Tarver had presented a separate assignment of error for his argument, we are left with little to review because defense counsel conceded at sentencing that the offenses do not merge.  The failure to challenge the non-merger of offenses at sentencing forfeits all but plain error. *State v. Bailey*, 2022-Ohio-4407, ¶ 7.  To demonstrate plain error, Tarver would need to show that

the error was an obvious defect in the proceedings that affected the outcome of those proceedings. *Id.* at ¶ 8; *State v. Rogers*, 2015-Ohio-2459, ¶ 22.

**{¶ 26}** Tarver argues that the totality of the circumstances indicates that he committed the rapes in one continuing course of conduct. Tarver argues that it is "not enough" that D.W. broke Tarver's grasp and tried to get away during an interval between the two rapes, because that interval was very brief and because Tarver committed the same conduct before and after that interval. (Appellant's Brief at 32.)

**{¶ 27}** If a defendant commits two identically defined offenses but commits them "separately or with a separate animus as to each . . . the defendant may be convicted of all of them." R.C. 2941.25(B). A defendant can commit the offenses separately if "the defendant at some point broke a temporal continuum started by his initial act." (Internal quotation marks deleted.) *State v. Nuh*, 2010-Ohio-4740, ¶ 16 (10th Dist.), quoting *State v. Roberts*, 2009-Ohio-298, ¶ 14 (3d Dist.), quoting *State v. Williams*, 2008-Ohio-5286, ¶ 37. Tarver's argument essentially concedes that there was a break in the temporal continuum between the two offenses, but he contends that the break was inadequate under the specific facts of this case. When an allied offenses argument is "so driven by factual distinctions, any asserted error [is] not obvious." *Bailey* at ¶ 16. Tarver's fact-driven argument does not establish that the trial court committed plain error by failing to sua sponte merge his two rape offenses, despite defense counsel's concession that the offenses should not merge.

### 2. Manifest Weight

**{¶ 28}** Even where evidence is legally sufficient to support a defendant's convictions, a reviewing court is able to reverse the judgment if the jury's verdict was against the manifest weight of the evidence. *State v. Robinson*, 162 Ohio St. 486, 487 (1955). When deciding if a conviction is against the manifest weight of the evidence, a reviewing court must determine " 'whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Thompkins*, 78 Ohio St.3d at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). A manifest-weight challenge can succeed "only in the exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶ 29} Tarver first argues that D.W.'s description of the rapes could not be believed because it was physically impossible. He claims that D.W. indicated that Tarver unzipped and pulled down his pants, licked D.W.'s breast, rubbed her crotch, grabbed D.W. with both hands, and had sex with her while she was facing away from him "*all at the same time.*" (Emphasis sic.) (Appellant's Brief at 20.) The record does not support Tarver's claim that everything occurred simultaneously, and Tarver himself notes later in his brief that D.W. testified that Tarver committed the foregoing actions over the course of approximately three to six minutes.

{¶ 30} Next, Tarver argues that D.W. was generally not a credible witness and that the jury lost its way by ignoring evidence indicating that the sex was consensual. Tarver points out that D.W. failed to share certain details during her interviews with the detective and the sexual assault nurse examiner, such as the direction D.W. was facing during the rapes. And D.W. was inconsistent on certain details, such as whether Tarver used lubrication and whether he gave money to D.W. by handing it to her or throwing it on the ground. Tarver notes that Houseworth testified that she thought D.W.'s demeanor after leaving the VIP room was inconsistent with a person who had just been raped, that Tarver regularly asked dancers for sex, and that Tarver did not react angrily when Houseworth declined his request for a private dance and sex.

{¶ 31} None of Tarver's arguments destroy the bridge between the state's evidence and the conclusions that the jury would need to reach to find Tarver guilty of rape. We cannot reverse a conviction on manifest-weight grounds merely because there were conflicts or inconsistencies in the testimony at trial. *State v. Scott*, 2019-Ohio-4175, ¶ 16 (10th Dist.). It was within the province of the jury to believe D.W.'s testimony and to give less weight to Houseworth's testimony. *See State v. Antill*, 176 Ohio St. 61, 67 (1964) (a jury "may believe or disbelieve any witness or accept part of what a witness says and reject the rest"). We cannot substitute our own judgment for that of the jury in choosing "between credible witnesses and their conflicting testimony." *State v. Awan*, 22 Ohio St.3d 120, 123 (1986).

{¶ 32} We have reviewed the record in its entirety, and we do not find that the jury clearly lost its way in resolving any conflicts in the evidence. Accordingly, Tarver's

convictions are not against the manifest weight of the evidence, and we overrule his first assignment of error.

## B. Inconsistent Verdicts

{¶ 33} In his second assignment of error, Tarver asserts that the jury's guilty finding on two counts of rape was inconsistent with its acquittal on one count of gross sexual imposition. He argues that the verdicts hinged on D.W.'s credibility, and if the jury did not think that D.W. was credible regarding one count, then the only rational verdict would have been an acquittal on all counts.

{¶ 34} We disagree with Tarver's premise that the jury's decision hinged solely on D.W.'s overall credibility and that the state presented an all-or-nothing case. The verdicts are easily reconcilable. All of Tarver's charges required proof that he "purposefully compelled [D.W.] to submit by force or threat of force." (Indictment at 1.) *See* R.C. 2907.02(A)(2); 2907.05(A)(1). D.W.'s testimony indicated that Tarver physically incapacitated D.W. in a bearhug grip while having sex with her, but not when he licked her breast or grabbed her crotch. The jury could have rationally concluded from this evidence that the state proved the element of force regarding the rape charges but not regarding the charge of gross sexual imposition.

{¶ 35} Even if the evidence did not clearly justify the jury's different verdicts on Tarver's charges, it is well-settled that the verdicts on multiple charges do not need to be consistent to be valid. *Dunn v. United States*, 284 U.S. 390, 393 (1932); *Griffin v. State*, 18 Ohio St. 438, 444-45 (1868). Inconsistent verdicts can simply be a sign of " 'mistake, compromise, or lenity.' " *State v. Gardner*, 2008-Ohio-2787, ¶ 81, quoting *United States v. Powell*, 469 U.S. 57, 65 (1984). Generally, "once the jury has heard the evidence and the case has been submitted, the litigants must accept the jury's collective judgment." *Powell* at 67. The jury's verdicts are not impermissibly inconsistent, and we therefore overrule Tarver's second assignment of error.

## C. Admission of Testimony

{¶ 36} In his third assignment of error, Tarver asserts that the trial court should not have admitted the state's evidence of D.W.'s narrative statement to the sexual assault nurse examiner. Tarver did not object to the state calling the nurse as a witness, the admission of

D.W.'s narrative report, or the nurse's testimony regarding the narrative report. He concedes that we can only review his assertion for plain error under Crim.R. 51(B). Tarver's burden under the plain-error standard is to "show that an error occurred, that the error was plain, and that but for the error the outcome of the trial clearly would have been otherwise." *State v. Ford*, 2019-Ohio-4539, ¶ 124.

{¶ 37} Tarver argues that D.W.'s narrative statement constituted hearsay under Evid.R. 801(C), and that at least some of the statement was not subject to the hearsay exception under Evid.R. 803(4) because it was not necessary for the purpose of medical diagnosis or treatment. Tarver notes, though, that the narrative statement was cumulative to D.W.'s testimony at trial. If a hearsay statement is merely cumulative to evidence that was properly admitted at trial, admission of the statement is not plain error. *See State v. Crosky*, 2007-Ohio-6533, ¶ 25 (10th Dist.) (finding no plain error in the admission of a child's statements to a caseworker where the majority of the statement was cumulative to the child's testimony); *State v. Hogg*, 2011-Ohio-6454, ¶ 46 (10th Dist.) ("the erroneous admission or exclusion of hearsay, cumulative to properly admitted testimony, constitutes harmless error").

{¶ 38} Although Tarver claims that the cumulative nature of D.W.'s narrative statement was problematic, he does not claim at any point in his argument that the outcome of his trial would have been different but for the admission of the statement. Tarver has therefore failed to establish plain error, and we overrule his third assignment of error.

## IV. Disposition

{¶ 39} Having overruled Tarver's three assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

DORRIAN and EDELSTEIN, JJ., concur.

———————————