[Cite as *State v. Smiley*, 2025-Ohio-2674.]

## COURT OF APPEALS OF OHIO

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 114178 |
| v. | : | |
| LAVANDA T. SMILEY, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** July 31, 2025

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-24-689724-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney and Sarah J. Denney, Assistant Prosecuting Attorney, *for appellee*.

Cullen Sweeney, Cuyahoga County Public Defender and Noelle A. Powell-Sacks, Assistant Public Defender, *for appellant*.

MARY J. BOYLE, J.:

{¶ 1} Defendant-appellant Lavanda T. Smiley ("Smiley") appeals his convictions for four counts of rape, four counts of sexual battery, and one count of

gross sexual imposition, arguing ineffective assistance of counsel, plain error, and that his convictions are against the manifest weight of the evidence. For the reasons that follow, we affirm Smiley's convictions.

## I. Facts and Procedural History

{¶ 2} In March 2024, Smiley was charged in a 20-count indictment stemming from allegations that he sexually assaulted his daughter ("the victim") and a niece in 2012 and 2013.[1] He was charged with eight counts of rape, eight counts of sexual battery, and two counts of gross sexual imposition with his daughter as the named victim.[2] Smiley proceeded to a jury trial, at which the following evidence was adduced.

{¶ 3} When the victim was 14 years old, she went to live with her father, Smiley, and his wife at the beginning of the 2012 school year. The victim testified she moved in with Smiley because "[i]t was more stable than the situation I had going on with my mother. I was the only child with her. Everybody else was gone." (Tr. 496.) She explained that her mother ("Mother") and her stepfather divorced and four of her siblings went with her stepfather. Her oldest sibling lived on her own in North Carolina. The victim testified that, at the time, she had an "okay" relationship with Mother, but she "was a little angry teenager." (Tr. 498.)

---

[1] Smiley was found not guilty of two counts of gross sexual imposition with his niece as the named victim. Therefore, this opinion will be limited to the facts that involved his daughter.

[2] The rape and sexual battery charges included sexually violent predator specifications, which were submitted to the bench.

{¶ 4} The victim stated that Mother lived in Lorain County while she lived with Smiley and his wife in Cleveland, Ohio. She identified a picture of Smiley's house on East 81st Street and described the layout. The victim testified that she was happy at Smiley's, that they were a family, and that they spent a lot of time with Smiley's wife's family. She acknowledged that she did not have any supervision, so she skipped school a lot.

{¶ 5} The victim testified that on New Year's Eve Day in 2012, she was home alone with Smiley when he asked her to come down from her bedroom and watch a movie with him. She came downstairs and sat on the couch with Smiley. She testified he laid his head in her lap and put his hand on her thigh up towards her private area, into her underwear, and touched her "privates." (Tr. 511.) She testified that he then laid on the floor, took off her underwear and shorts, pulled his underwear and pants down to his knees, and "he put his penis inside [her] vagina." (Tr. 511.) The victim testified that she "just froze." (Tr. 511.) She testified that it lasted ten minutes and he ejaculated in his hand. She remembered that she was menstruating at the time and wore a maxi pad. She testified that after Smiley finished, he asked if she wanted to go to her grandmother's house, which is Smiley's mother. She testified that they cleaned themselves up and went to her grandmother's house. On the way to her grandmother's house, Smiley said to the victim, "Cat got your tongue?" (Tr. 515.) The victim testified that Smiley was always drinking and that day he was drinking long island ice teas from a can, and she could

smell it. The victim testified she did not tell anyone at that time because she "didn't know how." (Tr. 516.)

{¶ 6} The next incident happened in January 2013. The victim testified that she was in her bedroom, sleeping on her stomach, when Smiley came into her room pulled her underwear and shorts down and "put his penis inside of [her] vagina." (Tr. 519.) She said that he did not say anything, she did not know if he ejaculated, he just left and she "just kept laying there." (Tr. 520.)

{¶ 7} After this incident, the victim told her half-sister ("Sister"), Smiley's other daughter who was six months older than her, that "our dad raped me." (Tr. 522.) She stated that Sister called her a liar; however, Sister reported it to someone at school.

{¶ 8} Thereafter, the victim testified that she spoke with a social worker from Cuyahoga County and told her that "even if something did happen, I wasn't going to tell her." (Tr. 525.) The victim testified that she was very confused and liked living with Smiley because of the lack of supervision. The victim even physically fought with Mother not to leave Smiley's. She stated that it was because "she did not want to burden her [Mother]" and she liked the freedom at Smiley's house. (Tr. 535.)

{¶ 9} After the first report, the victim remained at Smiley's home, except when the victim was suspended for skipping school. When she was suspended, Smiley sent her to his mother's house, but "that didn't work 'cause me and her didn't

get along." (Tr. 525.) As a result, she went back to Smiley's house, and he touched her again.

{¶ 10} The victim explained that it happened during a party for her 15th birthday, which is in mid-January 2013. She testified that Smiley came into her room to help her rehang a curtain and then he put his hands in her pants and digitally penetrated her. She said that they heard someone coming up the stairs, so he left. She testified that Smiley smelled of alcohol at that time.

{¶ 11} The next incident happened when she was again suspended from school. The victim testified that she was cold and sitting next to the heating vent in the living room when Smiley came home from work early. She stated that Smiley looked at her and said, "You told on me?" The victim stated she did not answer, she just stared at him. He then sat down next to her, removed the blanket she had on, pulled her pants and underwear off, and "put his mouth on my vagina." (Tr. 531.) He then left to pick up his wife from work. The victim testified that she "just kept freezing" when the incidents took place. (Tr. 533.) She testified that her mind was blank because "it was just too much of an emotion." (Tr. 533.) She stated that these incidents were her first sexual experiences.

{¶ 12} The last incident happened on February 1, 2013. The victim explained that Smiley called her to his room where he was laying on his stomach in bed watching television. He told her to "come here," and then he grabbed her arm and pulled her down onto the bed with him. (Tr. 540.) He laid her on her stomach, pulled her pants and underwear down, and "he put his penis inside my butt."

(Tr. 541.) She told him "it hurt; and after a while, I told him I had to go." (Tr. 541.) She did not know if he had ejaculated. The victim testified that she went to the bathroom, wiped off, and left. She testified that she could not sit down all day because of the pain.

{¶ 13} Mother picked her up and took her to the hospital. At the hospital, she underwent a sexual assault exam. She stated that the exam "felt like just more violations." (Tr. 543.) She does not remember what she told the nurse, but she did not tell her she was anally raped. She testified that she had thoughts of hurting herself because because she did not "like big emotions, and that's all it was, and it just felt like I was hurting everybody, and I was confused. Just wish it would end." (Tr. 543.) She explained that she always blames herself.

{¶ 14} After the exam, she was transported to Belmont Pines, a pediatric psychiatric facility, because of her threats of suicide. While at Belmont Pines, she tried to go to therapy but could not talk about the incidents. She testified that she only gave them "the gist of it. That he raped me." (Tr. 548.) She testified that it has taken her years to describe the details and still does not want to talk about it.

{¶ 15} The victim testified that after a week at Belmont Pines, Mother picked her up and, on the drive back home she gave Mother "a really hard time." (Tr. 551.) She testified that she felt "tainted. I wasn't good enough to be her daughter." (Tr. 551.) She threatened to harm herself again, so Mother took her to University Hospitals where she stayed for several days.

{¶ 16} When the victim left the hospital, she stayed with Mother in Lorain County. The victim testified that she spoke with the Lorain County social worker but did not give her much detail. She stated that she was interviewed by a detective at the Cleveland Police Department Sex Crimes Unit, and she "froze." (Tr. 557.) She "still didn't want nobody to know the truth." (Tr. 557.) She never went back to the station.

{¶ 17} Nearly ten years later, an investigator with the Cuyahoga County Prosecutor's Office contacted to her. The victim testified that she tried to ignore her, but when the investigator would not leave her alone, she started to cooperate.

{¶ 18} On cross-examination, the victim testified that "[Mother] took me [to the hospital] because if I'm telling her that [Smiley] raped me, then he took my virginity, so she figured there would just be something." (Tr. 582.) The victim explained that when she uses the expression "rape," she means sexual intercourse. The victim also explained that she did not initially disclose details to the investigator and "disappeared from them" for about a year. (Tr. 589.)

{¶ 19} Sister testified next and explained that she lived with her grandmother, Smiley's mother, growing up. She met the victim when they were in 8th or 9th grade. Sister said they had a good relationship. She testified that when they were celebrating their great-grandmother's birthday party in January 2013, the victim told her she had something to tell her. So, they went outside for a walk and the victim said, "[W]ell, me and daddy had sex." (Tr. 611.) Sister said neither of

them knew what to say or do so they went back inside. She testified that she did not tell anyone at the party.

{¶ 20} Sister testified that she had a great relationship with Smiley and that nothing like that ever happened to her. She indicated that she told a teacher that she was close with because she needed to talk to someone. At the time, she did not know that the teacher reported it until she had to talk to a social worker.

{¶ 21} According to Sister, Smiley had a drinking problem and it affected his health. She stated that Smiley's wife and mother also drank often. Sister testified that the victim became distant with her after the disclosure.

{¶ 22} On cross-examination, Sister admitted that she accused the victim of trying to attract attention to herself with the allegations. She testified that the victim started acting differently and "it didn't make sense to her." (Tr. 621.) Sister testified that after the allegations, the victim still wanted to have a relationship with Smiley and that did not make sense to her, so she began to doubt the victim.

{¶ 23} The State called Heather Cigoi ("Cigoi") next. Cigoi testified that at the time of the incidents she worked for Cuyahoga County Children and Family Services as a child protective worker in the sex abuse unit. Cigoi said the victim's case came in on February 18, 2013, as a priority one call, which means that the alleged perpetrator had access to the alleged victim. This meant she must make contact with the victim within an hour of the report to ensure the child's safety. Cigoi testified that she was unable to do that in this case, but she was able to set up an interview with Sister and spoke with Smiley informing him of the allegations.

{¶ 24} On January 24, 2013, Smiley brought the victim in for an interview with Cigoi. She noted that Smiley and the victim's body language seemed very distant. Cigoi interviewed the victim, and the victim made conflicting statements. First, the victim stated that it did not happen, then she stated, "[Y]ou already know what happened[,]" then she stated, "Even if it did happen, I would not tell you." (Tr. 650-651.) After speaking with the victim, Cigoi interviewed Smiley. She said he was cooperative. He denied the allegations and talked about drinking vodka and how Mother dropped the victim off at his house six weeks ago. Cigoi also interviewed Sister that same day.

{¶ 25} On January 31, 2013, Cigoi spoke with Mother and informed her of the allegations. Cigoi testified that Mother appeared upset and unaware of the allegations. She also reported it to the Cleveland Police Department, as required by law. Soon thereafter, Cigoi learned the victim was in Belmont Pines and would live with Mother when released. So, she referred the case to Lorain County Children and Family Services.

{¶ 26} Officer Brian Brinker ("Officer Brinker") of the Cleveland Police Department testified that on January 31, 2013, he took the initial rape report from Cigoi. He then passed the report on to the Sex Crimes Unit. During Officer Brinker's testimony it was learned that a second rape report was taken after Officer Brinker's report. The second report was taken by Officer Leonard Moore who was deceased at the time of trial.

{¶ 27} Mother testified next. She detailed the tumultuous circumstances of her divorce, their living situation, and how the victim ultimately started living with Smiley. Mother described the victim as quiet but an exceptional student prior to living with Smiley. She was shocked to learn the victim was skipping school while living with Smiley. When Mother learned of the allegations from Cigoi, she went to the victim's school and wanted to move her back home. Mother testified that she drove the victim to Smiley's to get her things and when they arrived at Smiley's the victim refused to leave with her. Mother explained that they got into "a tussle in the front yard." (Tr. 733.) In the end, the victim stayed with Smiley.

{¶ 28} On February 1, 2013, Mother drove to Smiley's to retrieve the victim. She testified that when the victim came outside, she looked disheveled and "kind of just spaced out." (Tr. 738.) She testified that she "just knew" something happened, so she drove her to the hospital. (Tr. 739.) Mother testified that she asked the victim, "[D]id he penetrate?" and she replied, "Yes." (Tr. 741.) Mother stated that she was not in the room when the exam took place.

{¶ 29} After the exam, the victim became angry and uncontrollable. The victim made suicidal threats and kept saying that she hated Mother. Eventually, the decision was made to send the victim to Belmont Pines for evaluation and treatment. After several days at Belmont, the victim was released to Mother. Mother stated that on the drive home, the victim starting lashing out at Mother again, threatening suicide, so Mother drove her straight to University Hospitals where she was admitted for another few days.

{¶ 30} When the victim was released from the hospital, she went to live with Mother. Mother testified that she was afraid to leave the victim alone and would have people sit with her when Mother went to work. She testified that a social worker from Lorain County came to her house to interview Mother and the victim. When Mother took the victim to be interviewed by the detective, the victim shut down and would not speak with the detective, so they left. She never spoke with the police after that.

{¶ 31} Kathleen Hackett ("Hackett"), a registered nurse from University Hospitals, Rainbow Babies and Children's Hospital, testified that she has a specialty in forensic nursing and has been a certified sexual assault nurse examiner ("SANE") in pediatric sexual assault since 2010. Hackett detailed her education and experience and explained how a sexual assault exam is conducted and what information is gathered. She testified that a SANE nurse takes a history from the alleged victim to determine the steps that need to be taken during the exam, as well as to determine what medical treatment is needed.

{¶ 32} Hackett identified the victim's medical records and explained that the SANE nurse who conducted the victim's exam had passed away in 2023. She then described the contents of each document in detail to the jury. According to Hackett, the SANE nurse documented that the victim reported vaginal penetration by a penis. But anal penetration was not indicated. The question regarding consensual activity within 96 hours was left blank. Hackett then read the narrative into evidence, which included details of the first incident of vaginal sex on New Year's Eve, and the last

incident of vaginal sex that happened the morning of February 1, 2013. The exam revealed anal abrasions. Hackett testified that a SANE nurse is required to report the incident to police and that the sexual-assault kit is then sealed and secured in a locked cabinet until law enforcement retrieves it.

{¶ 33} On cross-examination, Hackett testified that the anal abrasions could have been caused by the victim scratching at her hemorrhoids. On redirect she testified the abrasions could also have been caused by penile penetration.

{¶ 34} Mary Lee Davis ("Davis") from Lorain County Children and Family Services testified next. Davis testified that in 2013 she was a direct service worker who provided services to families and investigated child abuse, sex abuse, and neglect. As it pertains to the Smiley case, she testified that she received the referral from Cuyahoga County on February 4, 2013. Davis summarized the information she obtained from the referral. She testified that while the victim was at Belmont Pines, Davis interviewed Mother to assess the victim's safety and Mother's cooperation and shared with the jury that Mother was cooperative and protective of the victim. Then Davis stated that she interviewed the victim at her home on February 14, 2013. Davis testified to the details of the first incident and the last incident as it was conveyed to her by the victim. She stated that the victim was very protective of Smiley and did not want him in trouble. Davis indicated that when she interviewed Smiley, he was "pretty laid back" and did not seem concerned or nervous. (Tr. 894.) Smiley denied the allegations and told Davis that the victim "sees him as a boyfriend." (Tr. 896.) Davis testified that she forwarded her investigation to

Detective James Butler ("Det. Butler") in the Cleveland Police Department and then closed the case.

{¶ 35} Christine Scott ("Scott"), a forensic DNA analyst from the Cuyahoga County Medical Examiner's Officer, testified next. She detailed her education and experience, the labs accreditations, and was qualified as an expert by the court without objection by Smiley. Scott explained how sexual assault kits are processed at the lab. She identified the victim's sexual assault kit and the victim's oral swabs that were submitted to the lab and explained what was obtained during the victim's sexual assault exam. Scott then identified the DNA report and explained that seminal fluid had been detected on the vaginal and anal swabs. She testified that seminal fluid was identified by a positive prostate specific antigen test. A DNA profile, however, could not be obtained because there was no sperm. Scott explained why a DNA profile may not be present.

{¶ 36} Scott then explained that she did not conduct the original testing but was directed by the State to do a technical review of the original testing because the original analyst was unavailable for trial. She testified that she did a technical review of the case and concluded that the original testing was accurate to a reasonable degree of scientific certainty.

{¶ 37} Investigator Christy Kernik ("Kernik"), from the Cuyahoga County Prosecutor's Office cold case unit, testified that she began her investigation at the end of 2020. She located the victim and spoke with her in June 2021, but the victim did not want to cooperate until July 2021. Kernik described her investigation, and

her interview with Smiley was played for the jury. During the interview, Smiley suggested that the victim was fabricating the allegations because she was jealous of Sister and the victim had mental health problems.

{¶ 38} At the close of the State's case, one count of rape and one count of sexual battery were dismissed pursuant to Crim.R. 29. Those counts pertained to the allegations of digital penetration on February 1, 2013.

{¶ 39} Smiley testified on his own behalf and denied the allegations.

{¶ 40} The jury found Smiley guilty of four counts of rape, four counts of sexual battery, and one count of gross sexual imposition, which counts related to the vaginal intercourse alleged on New Year's Eve; the vaginal intercourse alleged during the nighttime in January 2013; and the vaginal and anal intercourse alleged on February 1, 2013. He was found not guilty of three counts of rape, three counts of sexual battery, and one count of gross sexual imposition.[3] The court found Smiley not guilty of the sexually violent predator specifications and sentenced Smiley to a total of nine years in prison, and five years of mandatory postrelease control. He was deemed a Tier III sex offender. And the court waived fines and costs.

{¶ 41} Smiley now appeals raising the following assignments of error for review:

> **Assignment of Error I:** [Smiley] received ineffective assistance of counsel because his counsel failed to move to dismiss the charges on

[3] One count of rape and sexual battery involved allegations of digital penetration on New Year's Eve. One count of rape, sexual battery and gross sexual imposition involved allegations of digital penetration on the victim's birthday. Finally, one count of rape and sexual battery involved allegations of cunnilingus, when the victim was sitting by the heating vent.

the grounds of prejudicial pre-indictment delay (Fifth, Sixth, and Fourteenth Amendments to the United States Constitution; Ohio Constitution Article 1, Sections 10 and 16.)

**Assignment of Error II:** [Smiley] received ineffective assistance of counsel when, one, his counsel failed to object to the introduction of evidence that violated Mr. Smiley's rights under the Confrontation Clause and, two, when his counsel failed to object to repeated impermissible hearsay testimony. (Fifth, Sixth, and Fourteenth Amendments to the United States Constitution; Ohio Constitution Article 1, Sections 10 and 16.)

**Assignment of Error III:** The trial court committed plain error when it allowed testimony and admitted evidence in violation of the Confrontation Clause. (Fifth, Sixth, and Fourteenth Amendments to the United States Constitution; Ohio Constitution Article 1, Sections 10 and 16.)

**Assignment of Error IV:** [Smiley] received ineffective assistance of counsel because counsel failed to engage in pre-trial investigation. (Fifth, Sixth, and Fourteenth Amendments to the United States Constitution; Ohio Constitution Article 1, Sections 10 and 16.)

**Assignment of Error V**: [Smiley's] convictions are against the manifest weight of the evidence. (Fifth, Sixth, and Fourteenth Amendments to the United States Constitution; Ohio Constitution Article 1, Sections 10 and 16.)

{¶ 42} For ease of discussion, the assignments of error will be addressed out of order and together when appropriate.

## II. Law and Analysis

{¶ 43} In Smiley's first, second, and fourth assignments of error, he argues that he received ineffective assistance of counsel when his counsel (1) failed to file a motion to dismiss based on preindictment delay; (2) failed object to testimony that violated Smiley's right to confrontation; and (3) failed to properly investigate the charges or use the psychiatric reports effectively.

## A. Ineffective Assistance of Counsel

{¶ 44} To establish ineffective assistance of counsel, Smiley must demonstrate that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defendant so as to deprive him of a fair trial. *State v. Trimble*, 2009-Ohio-2961, ¶ 98, citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The failure to prove either prong of this two-part test makes it unnecessary for a court to consider the other prong. *State v. Madrigal*, 2000-Ohio-448, citing *Strickland* at 697; *State v. Giguere*, 2023-Ohio-4649, ¶ 28 (8th Dist.). Furthermore, in Ohio, every properly licensed attorney is presumed to be competent, and a defendant claiming ineffective assistance of counsel bears the burden of proof. *State v. Davis*, 2021-Ohio-4015, ¶ 25 (8th Dist.), citing *State v. Black*, 2019-Ohio-4977, ¶ 35 (8th Dist.), citing *State v. Smith*, 17 Ohio St.3d 98, 100 (1985). When evaluating counsel's performance on an ineffective-assistance-of-counsel claim, the court "must indulge a strong presumption" that counsel's performance "falls within the wide range of reasonable professional assistance." *Strickland* at 689; *see State v. Pawlak*, 2014-Ohio-2175, ¶ 69 (8th Dist.) ("A reviewing court will strongly presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.").

### 1. Preindictment Delay

{¶ 45} Smiley argues in his first assignment of error that he received ineffective assistance of counsel when his attorney failed to file a motion to dismiss the charges based on preindictment delay. He contends that the deaths of the lead

detective (Det. Butler), the SANE nurse, and a reporting officer caused him actual prejudice, and the State had no justifiable reason for the delay. The State argues that Smiley's arguments are speculative and that he has not established actual prejudice; therefore, a motion to dismiss for preindictment delay was futile. We find the State's argument more persuasive.

{¶ 46} In Ohio, the statute of limitations for rape is 20 years based on the date of the offense. R.C. 2901.13(A)(3). "'The statute of limitations for a criminal offense is a defendant's primary protection against overly stale criminal charges.'" *State v. Hopper*, 2024-Ohio-2635, ¶ 26, quoting *State v. Owens*, 2015-Ohio-3881, ¶ 2 (8th Dist.), citing *United States v. Marion*, 404 U.S. 307, 322 (1971). In this case, the date of the offenses included dates from December 2012 to February 2013. Smiley was initially charged in February 2023 and then he was reindicted in March 2024. Both dates are well within the statutory period.

{¶ 47} Nevertheless, the Due Process Clause of the United States and Ohio Constitutions also protect a defendant from unreasonable delays in prosecution. In *State v. Jones*, 2016-Ohio-5105, ¶ 12, the Ohio Supreme Court explained that "preindictment delay violates due process only when it is unjustifiable and causes actual prejudice." When a defendant claims preindictment delay, the defendant bears the burden of presenting evidence that the preindictment delay caused actual prejudice. *Id.*, citing *State v. Whiting*, 84 Ohio St.3d 215, 217 (1998), and *State v. Adams*, 2015-Ohio-3954, ¶ 99. After the defendant has provided evidence of actual

prejudice, the burden shifts to the State to produce evidence of a justifiable reason for the delay. *Id.*, citing *Whiting* and *Adams*.

{¶ 48} The *Jones* Court held that "[a]ctual prejudice exists when missing evidence or unavailable testimony, identified by the defendant and relevant to the defense, would minimize or eliminate the impact of the State's evidence and bolster the defense." *Id.* at ¶ 28, citing *State v. Luck*, 15 Ohio St.3d 150, 157-158 (1984). The Court explained that a determination of actual prejudice involves a "'a delicate judgment'" and a case-by-case consideration of the particular facts and circumstances of the case. *Id.* at ¶ 20, quoting *State v. Walls*, 2002-Ohio-5059, ¶ 52, quoting *United States v. Marion*, 404 U.S. 307, 325 (1971). The trial court must "consider the evidence as it exists when the indictment is filed and the prejudice the defendant will suffer at trial due to the delay." *Id.* Speculation is not sufficient to establish the defendant's burden. *Id.*, citing *Walls* at ¶ 56 (noting that Walls's claims of prejudice were speculative at best); *Adams*, 2015-Ohio-3954, at ¶ 100 (noting the difficulty for defendants claiming unconstitutional preindictment delay because "proof of prejudice is always speculative"). This standard was recently reaffirmed in *State v. Bourn*, 2022-Ohio-4321.

{¶ 49} In the instant case, Smiley contends that Det. Butler's testimony would have minimized or eliminated the impact of the State's evidence "because Det. Butler apparently concluded that [victim's] allegations were not credible." (Smiley brief, p. 20.) Smiley spends much time claiming that Det. Butler did not believe the victim and that is why he did not file charges in 2013; however, the testimony is clear

that the victim would not talk with the detective about the assaults because she "froze." (Tr. 561.) In addition, the victim testified that she would not talk about the assaults to the social worker, the medical staff at either hospital, or Mother. The victim testified that even when the State contacted her as an adult, she did not want to talk about the assaults and "tried to see if [the State] would go away, too, but they didn't. So, after a while, [she] started talking." (Tr. 561.) The victim's inability or unwillingness to talk about the assaults is the more likely reason charges were not filed until the victim was an adult. To conclude that the detective did not file charges against Smiley because he did not believe the victim is pure speculation and does not meet Smiley's burden of establishing actual prejudice.

{¶ 50} Alternatively, Smiley asserts that several witnesses' comments bolstered the State's case because the witnesses implied that "but for Det. Butler's recalcitrance or incompetence, Mr. Smiley would have been charged a decade earlier." (Smiley brief, p. 22.) Smiley points to the detective being difficult to get in touch with, Mother's comment that the detective was "ho-hum" about things, and the fact that the detective declined to interview the victim at the Child Advocacy Center in Lorain County as opposed to the Cleveland Police Department. (Tr. 759.) Contrary to Smiley's assertions, a review of the testimony does not support his contentions. Mother testified that the victim shut down prior to the detective's interview. While testifying, Mother explained that the detective seemed "ho-hum about everything," so she told the victim, "'Look, if it's too much, you don't have to [talk]. . . . I believe you. If it's too much, you just don't [talk].' So, we left." (Tr. 759.)

Clearly, Mother did not feel that the detective was pressuring the victim to talk. This can also be interpreted as the detective not wanting to retraumatize the victim, as opposed to being lazy as Smiley suggests. Furthermore, Mother's perception that Det. Butler was difficult to get in contact with, and Det. Butler's preference to interview the victim at the Sex Crimes Unit instead of in the Child Advocacy Center in Lorain County can also be interpreted as Det. Butler being busy, as opposed to him being uncaring. Again, it is unclear how any of this bolstered the State's case and can be categorized as pure speculation, which does not meet Smiley's burden of establishing actual prejudice.

{¶ 51} Next, Smiley argues that the death of the SANE nurse who conducted the victim's sexual assault exam caused him actual prejudice because he was unable to ask her why the question concerning whether the victim had consensual sex within the past 96 hours was left unanswered and why the records reflect that Mother was permitted in the exam room while the medical history was obtained, which is contrary to hospital policy. It is unclear how Smiley was prejudiced by the inability to ask the SANE nurse these questions. Smiley argues that the seminal fluid could have come from another sexual partner. Indeed, it seems that the unanswered questions worked in Smiley's favor. Smiley was free to argue that the seminal fluid came from someone else because the question was not answered. Further, Mother testified that she was not in the exam room during the exam. It is unclear how the error in the records caused Smiley actual prejudice. Accordingly, we cannot say that Smiley was prejudiced by the death of the SANE nurse.

{¶ 52} Finally, Smiley asserts that the death of a patrol officer who took a separate rape report as part of the original investigation prejudiced him; however, Smiley does not explain how he was prejudiced. The burden of demonstrating error on appeal falls on Smiley, and this court will not root out arguments to support his contentions. *See* App.R. 12(A)(2).

{¶ 53} Having found that Smiley did not establish actual prejudice, we do not need to reach the issue of unjustifiable delay. Further, "[t]he failure to do a futile act cannot be the basis for claims of ineffective assistance of counsel, nor could such a failure be prejudicial." *State v. Davenport*, 2018-Ohio-2933, ¶ 26 (8th Dist.); *State v. Kilbane*, 2014-Ohio-1228, ¶ 37 (8th Dist.). Accordingly, Smiley's first assignment of error is overruled.

## 2. Failure to Object

{¶ 54} Smiley argues in his second assignment of error that his attorney was ineffective when he failed to object to the testimony of the DNA analyst because her testimony violated the Confrontation Clause and the Lorain County Social Worker's testimony was inadmissible hearsay. We note that "'[t]he failure to object to error, alone, is not enough to sustain a claim of ineffective assistance of counsel.'" *State v. Dix*, 2023-Ohio-4123, ¶ 32 (8th Dist.), quoting *State v. Holloway*, 38 Ohio St.3d 239, 244 (1988).

### a. Forensic Analyst's Testimony

{¶ 55} First, Smiley challenges the testimony of the DNA analyst and the admission of the DNA report under the Sixth Amendment's Confrontation Clause.

According to Smiley, the trial testimony revealed that the testifying analyst had not conducted the physical testing. He argues that the Confrontation Clause protects his right to confront the analyst whose testing and statements the testifying analyst relied upon when the testifying analyst concluded that seminal fluid was detected in the victim's sexual assault kit. In support of his position, Smiley cites to the recently decided case from the United States Supreme Court — *Smith v. Arizona*, 602 U.S. 779 (2024).

{¶ 56} The State argues that *Smith* does not apply retroactively to Smiley because his case was not technically pending appeal when *Smith* was decided. The State further argues that the DNA analyst's testimony did not violate the Confrontation Clause, and that if it did, the error was harmless.

{¶ 57} Initially, we note that when a new rule of criminal procedure is announced, as in *Smith*, that rule applies retroactively for convictions that are not yet final. *Griffith v. Kentucky*, 479 U.S. 314, 322 (1987). "By 'final,' we mean a case in which a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied." *Id*. at 321, fn. 6. *Smith* was decided on June 21, 2024. Smiley was convicted by a jury in May 2024 and sentenced on June 25, 2024. He filed his notice of appeal on July 19, 2024. We find that *Smith* applies retroactively to Smiley's conviction because it was not final at the time *Smith* was decided.

{¶ 58} Next, we recognize that the Confrontation Clause assures that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the

witnesses against him[.]" This means that "admission of an out-of-court statement of a witness who does not appear at trial is prohibited . . . if the statement is testimonial unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness." *State v. Maxwell*, 2014-Ohio-1019, ¶ 34, citing *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004); *see also Bullcoming v. New Mexico*, 564 U.S. 647, 657 (2011). This prohibition "applies only to testimonial hearsay." *Davis v. Washington*, 547 U.S. 813, 823 (2006).

{¶ 59} Recently, in *Smith*, the United States Supreme Court addressed the hearsay issue as it relates to a forensic expert testifying and held that "[w]hen an expert conveys an absent analyst's statements in support of his opinion, and the statements provide that support only if true, then the statements come into evidence for their truth." *Id.* at 783. In *Smith*, one lab analyst tested suspected drugs, documented her work and conclusions in notes, and then prepared a report; however, prior to trial, the State requested a different analyst testify. *Id.* at 790. Since this new analyst had not participated in the drug testing, he reexamined the original, non-testifying analyst's report and notes, so that he could testify to his own "independent opinion on the drug testing performed by" the non-testifying analyst. *Id.* at 790. Nevertheless, the Supreme Court held that by relaying information documented by the prior analyst and by relying upon her results to form his opinions, the testifying expert had effectively offered the non-testifying analyst's statements into evidence "for their truth." *Id.* at 798. The Court, however,

remanded the case to the lower court to determine which statements were testimonial.

{¶ 60} In the instant case, the testifying DNA analyst, Scott, worked at the Cuyahoga County Medical Examiner's Officer at the Cuyahoga County Regional Forensic Science Laboratory as a forensic DNA analyst. Her duties included examining evidence for DNA processing, processing samples for DNA, interpreting and reporting her findings, as well as testifying in court. At trial Scott testified that the lab was accredited by ASCLD and the DNA lab was also accredited by the FBI. Scott described generally the procedures involved in testing sexual assault kits. She explained that the kits first went to serology, to test for body fluids such as blood and semen. After serology, the samples are tested for DNA.

{¶ 61} Scott then testified regarding the victim's sexual assault kit, explaining the processes used in 2013, as well as detailing every item examined and the type of chemistry used to obtain DNA profiles. The State questioned Scott specifically regarding the "Results and Conclusion" section of the DNA Report that simply stated: "Human seminal material was identified in items 1.1.1 [vaginal swabs] and 1.3.1 [anal swabs]. No seminal fluid was identified in item 1.2.1 [oral swabs]. No DNA profile foreign to [the victim] (item 1.8) was obtained from items 1.1.1 and 1.3.1." (State's exhibit No. 11.). The State asked:

> [STATE]: And then if you can go on to page two, there's a section labeled "results and conclusions." Can you walk us through what the results and conclusions were of the testing from this kit?

[SCOTT]: Yes. So first we have the serology statements, which I had mentioned, especially with sexual assault kits, we need to look for different types of fluid such as seminal material and blood. So, in items 1.1.1 and 1.3.1, the vaginal swabs and the anal swabs, human seminal material was identified.

[STATE]: And can we talk for a second about the testing that is used to identify human seminal material?

[SCOTT]: Yes. So, in our laboratory, testing for seminal material is a two-step process. The first step is a presumptive test. And it's presumptive in that you can have a positive test with something that is not seminal material because you're looking for a specific enzyme, acid phosphatase, which although found in very high concentrations in seminal material, is also sometimes found in lower concentrations in, for example, vaginal secretions.

So, it is a presumptive test in that if you have it positive, it does support that there's seminal material, but you cannot confirm it. So, in our laboratory, our second step is the confirmatory test.

There's two confirmatory tests that you can perform in our laboratory in 2013. The first one being the obvious presence of sperm. If you see sperm, you can confirm seminal material. The third is — or the second confirmatory test is testing for a prostate specific antigen which is found in seminal term in high quantities, but being that it is produced by the prostate, you're not going to find that in seminal — I mean, in vaginal secretions. It's going to be in seminal material produced by the prostate in the man.

So, in this case, we had — those presumptive tests were positive initially. And when we looked for sperm, we did not see any sperm. However, when we tested for the prostate specific antigen, it was positive. And it was positive for the vaginal swabs 1.1 .1 and the anal swabs 1.3.1, and so we said that human seminal material was identified in those two items.

[STATE]: Okay. And then the next section is — or not section. The next line down, no seminal material identified in item 1.2.1 and that was the oral swab?

[SCOTT]: Correct. So, for that example, all three tests in this case at the time were negative. So that presumptive test was negative for the oral swabs as well as no sperm were detected and that PSA test, that

other confirmatory test was also negative, so no seminal material was identified. . . .

[STATE]:  But you were able to determine that — or I should say, the test for the prostate specific – you called antigen?

[SCOTT]:  Yes.

[STATE]:  Was positive?

[SCOTT]:  Yes, for items 1.1.1 and 1.3.1, the vaginal and anal swabs.

[STATE]:  Okay. And so, based on your findings, was there ever a profile foreign to [the victim] able to be developed in this case?

[SCOTT]:  No.  No DNA profile foreign to [the victim] was obtained from the vaginal and anal swabs, 1.1.1 and 1.3.1.

[STATE]:  And what could be some reasons for that?

[SCOTT]:  So there could be different reasons.  The first one is that the prostate specific antigen test is actually a very sensitive test.  It can detect the prostate specific antigen in a very, very small amount of seminal material.  And that sensitivity does not necessarily equally equate to DNA detection and recovery.  So, although seminal material was identified in the sample, we did not have any foreign profile from the victim, but that is supported by the fact that, like I said, the sensitivity of the PSA test at the time is just extremely sensitive compared to the DNA profile.

[STATE]:  So you weren't able to identify enough foreign DNA to actually develop a profile except for the victim in this case?

[SCOTT]:  The only profile obtained was the victim.

(Tr. 926-929.)

{¶ 62} The following exchange then happened when questioned about which lab personnel conducted the testing and signed the report,

[SCOTT]:  So at the time the case was processed and interpreted by Laura Evans, a forensic scientist.  She, like me, was a forensic DNA analyst.  And the technical reviewer was the DNA technical manager and supervisor, Dr. Nasir[.]

[STATE]: And then when we do not have those people available to us, were you so kind, Ms. Scott, as to technically review this case for us?

[SCOTT]: Yes, I did.

[STATE]: And can you tell us, after doing that, did you — did you sign a technical review checklist as it relates to this sexual assault kit and its testing?

[SCOTT]: Yes, I did.

. . .

[STATE]: And Ms. Scott, before I close State's Exhibit 11, would these results have been to — to the appropriate degree of scientific certainty from the lab?

[SCOTT]: Yes.

[STATE]: Okay. And is this report a true and accurate depiction of the testing and the results that were found on [the victim's] sexual assault kit?

[SCOTT]: Yes. . . . So this [State's Exhibit 12] is our -- the DNA unit's technical review checklist.

[STATE]: Okay.

[SCOTT]: It's performed in every one of our cases. Every DNA case after being processed by an analyst has to be technically reviewed by another qualifying analyst or the DNA technical leader and supervisor.

[STATE]: And is this — did you technically review this checklist yourself?

[SCOTT]: I did, yes. So I basically reviewed all of the serology testing, the case file, all of the process of obtaining the profiles. I did what I would always do if I technically reviewed another person's case before the case is released.

[STATE]: Okay. And then what did you find in this technical review?

[SCOTT]: I found that everything was processed appropriately and all of the requirements that are needed to be met for the accreditation of the lab were met. And so I signed it on April 22nd of 2024.

(Tr. 932-934.)

{¶ 63} Based on the record before this court, it appears that the testifying DNA analyst testified to and relied upon the testing analyst's statements and notes for their truth, which is now considered hearsay after the United States Supreme Court decision in *Smith*. But our analysis does not end there; we turn now to the second part of the test, which is whether the statements are testimonial.

{¶ 64} In a similar case, *State v. Hale*, 2024-Ohio-5579 (1st Dist.), the First District Court of Appeals addressed this exact issue. The defendant, Hale, was convicted of rape and gross sexual imposition, based in part on DNA evidence analyzed by the Ohio Bureau of Criminal Investigation ("BCI"). At trial, two expert witnesses from BCI testified about the DNA analysis and authored reports stating their conclusions. Both experts relied on data, notes, and testing procedures performed by other non-testifying analysts at BCI to reach their conclusions. Hale was not able to cross-examine the analysts who performed the physical DNA testing. Applying *Smith*, the *Hale* Court found that when a DNA expert witness conveys or relies upon out-of-court statements to support their opinions, and those statements are offered for their truth, it constitutes inadmissible hearsay under the Confrontation Clause unless the declarant is made available for cross-examination. The court then determined that the statements were testimonial based on the Ohio Supreme Court's decision in *State v. Tench*, 2018-Ohio-5205, which held that statements made by forensic analysts at state crime labs during evidence testing and

analysis are testimonial in nature because the primary purpose of such analysis is to establish facts for use in a criminal prosecution. *Id.* at ¶ 213.

{¶ 65} We have the same circumstances in this case as in *Hale*. Here, a sexual assault kit was processed at a county laboratory for use in a criminal prosecution. Therefore, we find that the statements made by the absent analyst during evidence testing and analysis are testimonial in nature because the primary purpose of such analysis is to establish facts for use in a criminal prosecution. Consequently, the admission of the substitute analyst's testimony and the DNA lab report violated Smiley's confrontation rights because the statements were testimonial hearsay.

{¶ 66} Nevertheless, "Confrontation Clause claims are subject to harmless-error analysis." *State v. Beasley*, 2018-Ohio-493, ¶ 178, citing *State v. McKelton*, 2016-Ohio-5735, ¶ 192. "Constitutional error is harmless if it is determined to be harmless beyond a reasonable doubt." *State v. Thomas*, 2018-Ohio-2841, ¶ 31-32, (8th Dist.), citing *State v. Conway*, 2006-Ohio-791, ¶ 78, citing *Chapman v. California*, 386 U.S. 18, 24 (1967). "Whether a Sixth Amendment error was harmless beyond a reasonable doubt is not simply an inquiry into the sufficiency of the remaining evidence. Instead, the question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Id.*, citing *Chapman* at 23. Confrontation Clause violations are harmless when "'"the remaining evidence, standing alone, constitutes overwhelming proof of [the] defendant's guilt."'" *State v. Carter*, 2024-Ohio-1247,

¶ 47, quoting *State v. Hood*, 2012-Ohio-6208, ¶ 43, quoting *State v. Williams*, 6 Ohio St.3d 281 (1983), paragraph six of the syllabus. Overwhelming proof becomes readily apparent when "'the allegedly inadmissible statements . . . at most tend[] to corroborate certain details'" of the state's case-in-chief. *Id.*, quoting *Schneble v. Florida*, 405 U.S. 427, 431 (1972). Accordingly, the admission of purely cumulative evidence in violation of the Sixth Amendment amounts to harmless error. *Id.*

{¶ 67} Upon a review of the record, we find any error in allowing this testimony and the DNA report was harmless beyond a reasonable doubt. Smiley was convicted of four counts of rape and sexual battery from three different dates. The testimony and lab report at issue only pertained to two of those counts for the last incident, and the DNA lab report did not identify Smiley as the contributor of the seminal fluid, it simply indicated that seminal fluid was detected on the vaginal and anal swabs. Although this evidence corroborated sexual conduct, it was not the only corroborating evidence to the last incident. The sexual assault examination revealed anal abrasions, and the victim testified that she could not sit down for days because her buttocks hurt. In addition, the victim reported to the SANE nurse that she had been vaginally raped that day. The testimony and lab report were merely cumulative evidence.

{¶ 68} Having found that Smiley was not prejudiced by the admission of the testimony and lab report, we cannot say that trial counsel was ineffective for failing to object to this evidence.

**b. Social Worker Testimony**

{¶ 69} Next, Smiley challenges the admissibility of the Lorain County Social Worker's testimony regarding the victim's description of the sexual assaults because it "went beyond non-testimonial statements and into statements taken for 'investigative or prosecutorial purposes.'" (Smiley brief, p. 36.) Smiley argues that his attorney was ineffective when he did not object to this inadmissible testimony. The State asserts that the social worker's testimony falls squarely within the boundaries of Evid.R. 803(4), and was thus admissible.

{¶ 70} Evid.R. 803(4) provides that "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment[,]" are not excluded by the hearsay rule, even though the declarant is available as a witness. This court has explained the application of this exception in instances involving the testimony of a child advocacy social worker who offers testimony in sexual assault cases:

> In sexual assault cases involving young victims, there is often testimony from a child advocacy social worker. And courts have acknowledged the "dual role" — medical diagnosis/treatment and investigation/gathering of evidence — of social workers who interview a child who may be the victim of sexual abuse. *See State v. Arnold*, 126 Ohio St. 3d 290, 2010-Ohio-2742, 933 N.E.2d 775, ¶ 33. Only those statements made for the purpose of diagnosis and treatment are admissible under Evid.R. 803(4). *State v. Muttart*, 116 Ohio St. 3d 5, 2007-Ohio-5267, 875 N.E.2d 944, ¶ 46 (regardless of whether a child less than ten years old has been determined to be competent to testify, the child's statements may be admitted at trial as an exception to the

hearsay rule if they were made for purposes of medical diagnosis or treatment); *State v. Goza*, 8th Dist. Cuyahoga No. 89032, 2007-Ohio-6837, ¶ 39. Social workers are oftentimes in the best position to help determine the proper treatment for the minor, which treatment includes determining which home was free of sexual abuse. *State v. Durham*, 8th Dist. Cuyahoga No. 84132, 2005-Ohio-202, ¶ 33, citing *Presley v. Presley*, 71 Ohio App.3d 34, 39, 593 N.E.2d 17 (8th Dist.1990).

To the extent a victim's statement to a social worker is for investigative or prosecutorial purposes, the statement will not fall within the hearsay exception under Evid.R. 803(4). *See State v. Rose*, 12th Dist. Butler No. CA2011-11-214, 2012-Ohio-5607, ¶ 42. The fact that the information initially gathered by the social workers was subsequently used by the state in its prosecution, however, does not change the fact that these statements were not made for investigative or prosecutorial purposes. *Muttart* at ¶ 62. Trial courts are entrusted with recognizing the point at which nontestimonial (admissible under Evid.R. 803(4)) statements become testimonial (falling outside the hearsay exception). *See Davis v. Washington*, 547 U.S. 813, 828, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).

*State v. Fears*, 2017-Ohio-6978, ¶ 37-38 (8th Dist.).

{¶ 71} In the instant case, the Lorain County Social Worker, Davis, testified that the purpose of her investigation was to assess the victim's safety and that she interviewed the victim at Mother's home two weeks after the last alleged incident of abuse. By the time Davis conducted the interview, the victim already had a sexual assault examination and was admitted to two separate psychiatric hospitals for mental health treatment. In addition, Davis had already spoken with Mother about the allegations and determined that the victim was no longer living with Smiley, and Mother was cooperative with the investigation and able to protect the victim from further abuse. Nevertheless, Davis relayed to the jury the victim's description of the sexual assaults that occurred on New Year's Eve 2012 and February 1, 2013. Based

on the circumstances of this case, we find that the victim's statements to Davis were not made for medical diagnosis or treatment and were thus inadmissible hearsay.

{¶ 72} Nonetheless, although some of the victim's statements were inadmissible under Evid.R. 803(4), we find any error that may have occurred was harmless, because these statements were cumulative of properly admitted evidence, specifically, the victim's testimony. *State v. Griffin*, 2025-Ohio-1459, ¶ 54 (8th Dist.) (finding that the improper admission of the forensic interview that included statements not made for medical diagnosis or treatment was harmless error because it was cumulative of properly admitted evidence, specifically the testimony of the victim) *See* Crim.R. 52(A) ("Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded."); *State v. Williams*, 38 Ohio St.3d 346, 350 (1988) (holding that the admission of a hearsay statement was harmless because the "contents of the statement were largely cumulative of the testimony of other witnesses at . . . trial"); *State v. Tarver*, 2025-Ohio-1190, ¶ 37 (10th Dist.) ("If a hearsay statement is merely cumulative to evidence that was properly admitted at trial, admission of the statement is not plain error."); *State v. Crosky*, 2007-Ohio-6533, ¶ 25 (10th Dist.) (finding no plain error in the admission of a child's statements to a caseworker where the majority of the statement was cumulative to the child's testimony).

{¶ 73} Our review of the record shows that the statements the victim made to the Lorain County Social Worker during the interview about Smiley sexually assaulting her were substantially similar to the victim's testimony at trial. Because

the social worker's testimony was cumulative to the victim's testimony, we cannot say that Smiley was prejudiced by trial counsel's failure to object.

{¶ 74} Accordingly, Smiley's second assignment of error is overruled.

### 3. Failure to Investigate

{¶ 75} In Smiley's fourth assignment of error, he argues that his attorney was ineffective because he failed to conduct pretrial investigation. He contends had his attorney investigated he would have discovered the three deceased witnesses and filed a motion for preindictment delay. Smiley also asserts that had his attorney reviewed the hospital records he could have challenged the State's theory that the victim suffered a psychiatric break down because of the rapes.

{¶ 76} Smiley cites *Wiggins v. Smith*, 539 U.S. 510 (2003), where the failure to investigate a defendant's background and present mitigating evidence on certain topics at his capital sentencing violated the defendant's Sixth Amendment right to counsel. The State points out that *Wiggins* was a death penalty case concerning an insufficient investigation on mitigation evidence. We note that when assessing counsel's investigation, the *Wiggins* Court applied *Strickland* and stated the reasonableness of counsel's performance is reviewed objectively under prevailing professional norms and considering the context. *Id.* at 523.

{¶ 77} With context in mind, we also recognize that where the record on appeal does not indicate the extent of counsel's pretrial investigation, an appellate court "will not 'infer a defense failure to investigate from a silent record.'" *State v. Thompson*, 2014-Ohio-4751, ¶ 247, quoting *State v. Were*, 2008-Ohio-2762, ¶ 244.

In the instant case, there is no indication in the record that Smiley's attorney was unaware of the deaths of the three witnesses. Furthermore, we have already determined in the first assignment of error that a motion for preindictment delay would have been futile because Smiley did not suffer actual prejudice by the loss of these witnesses.

{¶ 78} Smiley next argues his attorney was ineffective when he failed to impeach Mother with her testimony that she sent the victim to Smiley so she could "figure [things] out," when the records indicate that Mother sent the victim to Smiley because of conflicts between Mother and victim. In addition, Smiley argues that his attorney should have challenged the State's insinuation that all of the victim's mental-health issues arose after the alleged assault because the records indicate that the victim suffered mental-health issues prior to the allegations.

{¶ 79} Courts in Ohio have long held that "[t]rial strategy or tactical decisions cannot form the basis for a claim of ineffective counsel." *State v. Foster*, 2010-Ohio-3186, ¶ 23 (8th Dist.) citing *State v. Clayton*, 62 Ohio St.2d 45 (1980). Furthermore, "'[t]he extent and scope of cross-examination clearly fall within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel.'" *State v. Morton*, 2021-Ohio-581, ¶ 39 (8th Dist.), quoting *State v. Leonard*, 2004-Ohio-6235, ¶ 146. Specifically, it is outside our role as a reviewing court to "'scrutinize trial counsel's strategic decision to engage, or not engage, in a particular line of questioning on cross-examination.'" *Id.*, quoting *State v. Dorsey*, 2005-Ohio-2334, ¶ 22 (10th Dist.).

{¶ 80} We find that trial counsel's decision not to impeach Mother's testimony falls under trial strategy. A review of the record reveals that there was some evidence to suggest that Mother's testimony was less than truthful regarding her relationship with the victim and the reason she sent the victim to live with Smiley. Nevertheless, counsel's decision not to belabor the point was not deficient performance nor did it prejudice Smiley.

{¶ 81} Additionally, we find that trial counsel's decision not to delve into the onset of the victim's mental-health issues falls under trial strategy. Sadly, there is evidence in the record that suggests the victim was already suffering when she was sexually assaulted by Smiley. Had counsel emphasized this, it could have highlighted the vulnerability of the victim, which would not have worked in Smiley's favor. Therefore, counsel's decision not to emphasize the point was not deficient performance, nor did it prejudice Smiley.

{¶ 82} Accordingly, Smiley's fourth assignment of error is overruled.

## B. Plain Error

{¶ 83} In Smiley's third assignment of error, he contends that the trial court committed plain error when it allowed the substitute DNA analyst to testify and admitted the DNA report into evidence.

{¶ 84} To constitute plain error, there must be: (1) an error, i.e., a deviation from a legal rule, (2) that is plain or obvious, and (3) that affected substantial rights, i.e., affected the outcome of the trial. *State v. Pratts*, 2016-Ohio-8053, ¶ 34 (8th Dist.), citing *State v. Barnes*, 2002-Ohio-68; Crim.R. 52(B). As the Supreme Court

clarified in *State v. Rogers*, 2015-Ohio-2459, ¶ 28, the accused is "required to demonstrate a reasonable probability that the error resulted in prejudice — the same deferential standard for reviewing ineffective assistance of counsel claims." *Id.* at ¶ 22, citing *United States v. Dominguez Benitez*, 542 U.S. 74, 81-83 (2004); *State v. Thomas*, 2017-Ohio-8011, ¶ 33.

{¶ 85} As we determined in Smiley's second assignment of error, any error in the admission of the DNA analyst's testimony and the DNA report was harmless. Accordingly, Smiley's third assignment of error is overruled.

## C. Manifest Weight

{¶ 86} In Smiley's fifth assignment of error, he argues that his convictions are against the manifest weight of the evidence because the victim's credibility is questionable and the details of the incidents changed over time. We disagree.

{¶ 87} "[A] manifest weight challenge questions whether the prosecution has met its burden of persuasion." *State v. Bowden*, 2009-Ohio-3598, at ¶ 13, citing *State v. Thompkins*, 78 Ohio St.3d 380, 390 (1997). When reviewing a manifest-weight challenge, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Virostek*, 2022-Ohio-1397, ¶ 54, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). A reversal on the basis that a verdict is against the manifest weight of the evidence is granted "'only in the exceptional case in which the

evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *Martin* at 175.

{¶ 88} As this court has previously stated:

> The criminal manifest weight of-the-evidence standard addresses the evidence's effect of inducing belief. *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541 (1997). Under the manifest weight-of-the-evidence standard, a reviewing court must ask the following question: whose evidence is more persuasive — the state's or the defendant's? *Wilson* at *id*. Although there may be legally sufficient evidence to support a judgment, it may nevertheless be against the manifest weight of the evidence. *Thompkins* at 387; *State v. Johnson*, 88 Ohio St.3d 95, 2000-Ohio-276, 723 N.E.2d 1054 (2000).
>
> When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the fact finder's resolution of the conflicting testimony. *Wilson* at *id*., quoting *Thompkins* at *id*.

*State v. Williams*, 2020-Ohio-269, ¶ 86-87 (8th Dist.).

{¶ 89} A review of the record reveals that, for all but one occasion, the victim consistently reported and testified that Smiley had sexually assaulted her several times. Additionally, the victim was consistent in her description of when and where each incident happened. Although some of the specific acts were reported piecemeal, this is not unusual when trauma is involved. Here, the jury heard all the evidence and believed the victim, and we cannot say that the jury lost its way. This is not the exceptional case where the evidence weighs heavily against the conviction. Thus, based on the foregoing, Smiley's convictions are not against the manifest weight of the evidence.

{¶ 90} Accordingly, Smiley's fifth assignment of error is overruled.

**{¶ 91}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The appellant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, JUDGE

EMANUELLA D. GROVES, P.J., and
SEAN C. GALLAGHER, J., CONCUR